COUNTY OF KENT v. CITY OF GRAND RAPIDS.

NORTHERN AIR SERVICE, INC., v. TOWNSHIP OF CASCADE.
Opinion of the Court.

1. Taxation—Exempt Real Property—Use for Profit.

Lessees are subject to taxation in the same amount and to the same extent as though the lessee were the owner of the property when the property which for any reason is exempt from taxation is leased to and used by an individual, association, or corporation in connection with a business conducted for profit except where the use is by way of a concession in or relative to the use of a public airport or similar property which is available to the use of the general public (CL 1948, § 211.181, as amended by PA 1962, No 226).

---

References for Points in Headnotes
[1, 3, 7] 51 Am Jur, Taxation § 535.
  Meaning of, and rights imported by, term "concession." 14 ALR 627.
[2, 3, 5, 6] 8 Am Jur 2d, Aviation §§ 56, 57.
[4] 5 Am Jur 2d, Appeal and Error § 1009.
[8] 51 Am Jur, Taxation § 524.

2. AVIATION—AIRPORTS—CONCESSIONS.

Political subdivisions are authorized by statute to confer the privileges of concessions of supplying upon its airports goods, commodities, things, services, and facilities and to enter into leases, contracts, agreements, or grants of privileges of concessions with any person or persons provided rentals and fees are equal and uniform for the same type of facilities provided or services rendered and that in each case the public is not deprived of its rightful equal and uniform use of the facilities (CLS 1961, § 259.133).

3. TAXATION—EXEMPT PROPERTY—AIRPORTS—CONCESSIONS.

Long-term leases of 20 and 30 years of airport property to private corporations for the purpose of providing motel and restaurant facilities and services in connection with planes using the airport *held,* to be concessions relative to the use of a public airport and thus not such as to subject lessees to real property taxation under provisions relating to taxation of exempt real property where privileges granted in leases fully complied with requirement in statute providing for such concessions that the charges, rentals and fees for such facilities shall be equal and uniform for the same type of facilities provided (CL 1948, § 211.181, as amended by PA 1962, No 226; CLS 1961, § 259.133).

4. COSTS—PUBLIC QUESTION—CONCESSIONS AT AIRPORTS—TAXATION.

No costs are allowed in action to recover taxes paid under protest by concessionaries at county airport, a public question being involved (CL 1948, § 211.181, as amended by PA 1962, No 226; CLS 1961, § 259.133).

OPINION DISSENTING IN PART.

ADAMS, J.

5. TAXATION—STATUTES—WORDS AND PHRASES—CONSTRUCTION OF CONCESSION.

*"Concession", as used in the act exempting concession from taxation while operating on certain real property which is exempt from taxation, has been interpreted by the Supreme Court to mean more than the mere leasing, renting, or otherwise making available real property to a private individual, association, or corporation, in connection with a business conducted for profit and held to embrace the concept of exclusivity, although it alone is not controlling, and to embody specific obligations on the part of the privileged party to maintain particular services at specified times and to impose on the concessionaire the as-*

*sumption of a responsibility to perform a service customarily or needfully required in the operations to which the concession pertains (PA 1953, No 189, as amended by PA 1962, No 226).*

6. SAME—STATUTES—CONCESSION—PUBLIC USE—AIR SERVICES—RESTAURANT—MOTEL.

*Supreme Court interpretation of "concession" as used in the act exempting concessions from taxation while operating profit-making businesses on nontaxable real estate must be followed in determining if a business is a concession within the meaning of that act; consequently, where a county aeronautics board grants a lease of 10 acres of real property contiguous to the airport to a corporation for such use as it may elect to make of it in conducting its business of air service, flight instruction, aircraft sales, and air freight handling, with limited authority reserved in the lessor, an essential element for finding a concession, necessary and needful service for public use at the airport, is missing and the lessee corporation is not exempt from taxation; however, where the county aeronautics board grants a lease of space within the airport and terminal, subject to strict controls, to a corporation to operate restaurant, merchandise, and motel facilities, the obligations and controls imposed on the lessee show the lease was for conducting a subsidiary business and service within the airport and terminal relative to public use of the airport property, and therefore the corporation is operating a concession similar to those at a park, market, or fairground and is exempt from taxation (PA 1953, No 189, as amended by PA 1962, No 226).*

7. SAME—EXEMPTION—CONCESSIONS—LEGISLATIVE INTENT—PUBLIC USE—DURATION—APPRAISAL.

*Legislative intent to exempt from a tax statute, which has the purpose of taxing the use of real property otherwise exempt from tax when it has been leased, loaned, or otherwise made available to and is used by private individuals, associations, or corporations in connection with a business conducted for profit, concessions relative to use at public airports, parks, markets, fairgrounds, or similar property available to general public use evidences that the legislature was mindful that concessions would either be of short duration or could not be readily appraised for tax purposes (PA 1953, No 189, as amended by PA 1962, No 226).*

8. SAME—EXEMPTION—STRICT CONSTRUCTION—PRIOR INTERPRETATION—EQUALITY.

*An exemption in a tax statute must be strictly construed and in accordance with previous interpretations by the Supreme*

*Court, otherwise the exception will become the rule and the purpose of the statute to provide equality of taxation will be defeated.*

Appeal by leave granted prior to decision of Court of Appeals from Kent, Searl (Fred N.), J. Submitted June 11, 1968. (Calendar No. 3, Docket Nos. 51,714–51,716.) Decided May 5, 1969.

Complaints by County of Kent against City of Grand Rapids to recover 1965 and 1966 real property taxes paid under protest. Michigan Airport Managers' Association and others intervened on behalf of plaintiff. Complaint by Northern Air Service, Inc., and the County of Kent against Township of Cascade to recover real property taxes paid under protest. Michigan Airport Managers' Association and others intervened on behalf of plaintiffs. Caledonia Community Schools of Kent, Allegan, and Barry Counties intervened on behalf of defendant Township. Cases consolidated for trial and on appeal. Judgment for plaintiffs. Defendants and intervening defendant appeal by leave granted prior to decision by Court of Appeals. Affirmed.

*Law, Buchen, Weathers, Richardson & Dutcher,* for plaintiff County of Kent.

*Wheeler, Upham, Bryant & Uhl,* for plaintiff Northern Air Service, Inc.

*William P. Spaniola,* for plaintiff Michigan Aviation Trades Association and Michigan Airport Managers' Association.

*Dutchess, Mika, Miles, Meyers & Beckett* and *Rhoades, McKee & Boer,* for defendants and intervening defendant.

Kelly, J. This is an appeal from decisions of the Kent county circuit court in separate actions, here consolidated, and involves the interpretation of section 1 of PA 1953, No 189, as amended by PA 1962, No 226 (MCLA § 211.181 [Stat Ann 1968 Cum Supp § 7.7(5)]). In pertinent part, the statute here involved reads:

"When any real property which for any reason is exempt from taxation is leased, loaned or otherwise made available to and used by a private individual, association or corporation in connection with a business conducted for profit, *except where the use is by way of a concession in or relative to the use of a public airport, * * * or similar property which is available to the use of the general public,* the lessees or users thereof shall be subject to taxation in the same amount and to the same extent as though the lessee or user were the owner of such property." (Emphasis ours.)

Plaintiff county of Kent filed its complaint on September 30, 1965, stating that on August 30, 1963, it had, through the Kent county aeronautics board, entered into a 20-year lease agreement with Fred Harvey, whereby certain property of the Kent county airport was leased to said Fred Harvey for purposes of a motel and restaurant business on said premises; that defendant city of Grand Rapids levied its 1965 taxes on the premises so used as a motel and restaurant; that plaintiff paid said taxes under protest, and now seeks judgment for the amount so paid, claiming to be exempt from taxation by virtue of the above statute.

On March 8, 1966, plaintiffs Northern Air Service, Inc. (hereinafter called Northern), and the county of Kent filed their complaint against the township of Cascade, Kent county, Michigan, stating that said Northern Air Service had in October,

1962, leased from the Kent county aeronautics board, acting for and on behalf of the county of Kent, certain facilities, including hangars, offices and related buildings, and that defendant had assessed for real property taxes the lands and buildings owned by Kent county airport and leased to Northern and had levied 1965 taxes thereon; that plaintiff Northern paid said taxes under protest; that county of Kent is the real party in interest because it has agreed with Northern that in the event a real property tax or tax in lieu thereof is assessed against Northern based upon the value of the capital improvements provided and owned by Kent county airport, the rental to be paid by Northern to the Kent county airport should be reduced by the amount of such tax; that Northern is also a real party in interest in that under the terms of its agreement with plaintiff county of Kent, in the event such tax is assessed, Northern will pay additional rentals based upon gross sales.

On December 28, 1966, Hon. Fred N. Searl, circuit judge, entered judgment in each of the cases in favor of plaintiffs.

Leave to appeal prior to decision of the Court of Appeals was granted by the Supreme Court.

The Kent county department of aeronautics and board of supervisors determined that the proper operation of the terminal required that there be situated at the airport suitable restaurant facilities and a motel for use by the patrons or users of the airport and such members of the public as desired to use these facilities. The department further determined that there should be a "fixed base operator" at the airport to furnish certain services in connection with planes using the airport.

Pursuant to such recommendations, the county entered into a 20-year written lease with Fred Harvey, a nationally known corporation, to operate the

restaurant facilities, and a 30-year lease with Northern to perform the functions of the "fixed base operator."

The record sustains and appellants do not challenge the following findings of fact by the trial court:

"Under this lease Fred Harvey operates three restaurants, one a coffee shop, the second a full meal restaurant on the first floor of the terminal, and the third another full meal restaurant on the second floor of the terminal. Fred Harvey has a Michigan liquor license and has a bar and cocktail lounge in connection with each of the two full meal restaurants.

"Fred Harvey also furnishes some meals to the airlines to be served to passengers in flight.

"The motel is owned by the county and situated on airport property, and there are available 35 rooms for guests. Advance reservations account for from 80 to 90 per cent of its business, and lessee estimates from such information as it has been able to obtain that more than 90 per cent of its patrons have some dealings with the airport in one way or another—airline employees, passengers, persons meeting or taking passengers to the airport. The motel is open to the public and gets some of its business from patrons who have no dealings with the airport.

"Plaintiff introduced proofs which were not disputed to the effect that restaurant facilities are necessary to operating a modern airport, and that to make the operation of a good restaurant economically successful and to meet the requirements of the patrons, the serving of cocktails and other liquors is a practical necessity. Proof was further made that motel or hotel facilities are increasingly being made a part of the terminals of the large airports throughout the United States."

Said lease requires Fred Harvey to perform in accordance with the following:

"4. Lessee shall at all times provide personnel sufficient to operate the leased facilities on a standard equal to that maintained by comparable restaurant, concession and motel operations at comparable locations. Lessee will not maintain in its employ any personnel whose conduct lessor finds to be detrimental to the proper operation of the airport. All employees shall be neat and clean in their appearance at all times. All restaurant employees shall wear uniforms.

"5. Lessee agrees that it will adopt and use decorating schemes and motifs in harmony with the design and architectural treatment of the terminal building and will submit the same, including any proposed changes therein, to the department of aeronautics for its approval prior to installation.

"6. Lessee agrees to keep the coffee shop, the merchandise concession and newsstand, dining room and bar and cocktail lounge open for business during such hours as may be required to meet the reasonable demands for said services. Lessee shall provide breakfast, lunch and dinner service 7 days a week at least from 7:00 a.m. to 9:00 p.m. and shall provide a minimum food service during the entire 24 hours of each day. Such minimum service may consist of offering food only through vending machines. Lessee agrees to keep the motel open for 24 hours during each day.

"7. Lessee agrees that it will maintain the motel site in good condition and appearance and will keep the drives, walks and motel parking lot free and clear of snow and in good and safe condition. Lessee agrees that the motel parking lot shall be used only by registered guests of the motel, or their visitors, immediate prospective guests, persons employed at the motel, and suppliers doing business at the motel.

"8. Lessee agrees that it will not directly or through a subsidiary or enterprise affiliated with lessee operate competitive restaurant or motel facilities within 8 miles of the airport terminal building without the prior approval of lessor.

"9. Lessee agrees that the prices charged for all food, beverages and other merchandise sold on the demised premises shall be competitive with the established prices charged by similar restaurants, gift shops and other businesses selling like quality and quantities of similar food, beverages and merchandise and providing similar services."

The portion of the airport property leased to Northern consists of hangars and hangar space utilized by Northern for purposes of conducting its business of subleasing space for aircraft storage, maintenance, and the operation of a private flying school. The uses of subject property were characterized by witnesses for the plaintiffs as a "fixed base operator."

The lease between the Kent county aeronautics board, acting for and on behalf of the county of Kent, and Northern Air Service, Inc., provided that lessee will agree to observe and obey lessor's rules and regulations with respect to the use of the airport, protecting the safety of those using the airport; that lessee will furnish any services to be provided by it on a fair, equal and not unjustly discriminatory basis to all users thereof, and that it will charge fair, and not unjustly discriminatory prices for each unit of service; that lessee will under date of the commencement of the term of this lease file with the lessor a schedule of the rates and charges covering hangar rental fees, charges for tie-downs and charges for fuel. The lease provided further that any charges, revisions or additions to the original schedule so filed should immediately be filed with the lessor; also that in the event lessor should determine such rates or charges are unreasonable, and no agreement in relation thereto is reached between lessor and lessee, either party could by notice in writing to the other, submit the controversy or claim to arbitration.

The State of Michigan since the enactment of the aeronautics code of the State of Michigan[1] has encouraged and helped political subdivisions in the establishing of airports and has granted the right "to confer the privileges of concessions of supplying upon its airports goods, commodities, things, services and facilities: Provided, That in each case in so doing the public is not deprived of its rightful, equal and uniform use thereof." (CL 1948, § 259-.133 [Stat Ann 1953 Cum Supp § 10.233].)

And the amendment to this provision (PA 1959, No 181 [CLS 1961, § 259.133; Stat Ann 1968 Rev § 10.233]) provided the right

"to confer the privileges of concessions of supplying upon its airports goods, commodities, things, services and facilities; and to enter into leases, contracts, agreements or grants of privileges of concessions with any person or persons.    *    *    *    Such terms, charges, rentals and fees shall be equal and uniform for the same type of facilities provided, services rendered or privileges granted with no discrimination between users of the same class for like facilities provided, services rendered or privileges granted: Provided, That in each case in so doing the public is not deprived of its rightful, equal and uniform use thereof."

PA 1945, No 329 as amended[2] and PA 1951, No 206[3] created the "Michigan aviation matching fund" and the "Michigan aviation supplemental matching fund," respectively, for the purpose of assisting political subdivisions in the construction and improvement of public owned airports. The State contributed $800,000 toward the Kent county airport project.

---

[1] PA 1945, No 327, being CL 1948, § 259.1 et seq., as amended (Stat Ann 1960 Rev and Stat Ann 1965 Cum Supp § 10.101 et seq.).

[2] CL 1948, §§ 259.504, 259.506, 259.508, and CLS 1961, § 259.501 et seq.

[3] CLS 1961, § 259.511 et seq.

The Fred Harvey and Northern Air Service facilities were constructed under bond issues authorized by the Kent county board of supervisors and approved by the Michigan municipal finance commission.

Complaining about the trial court's finding, appellants state:

"The trial court appears to treat the relationship as pursuant to a lease but holds that it makes no difference under the exemption provision of Act 189.

"The appellants contend that the relationship created is that of a landlord and that such relationship causes the interest to be taxable under Act 189."

The trial court answers appellants' complaint, as follows:

"The use by the two lessees comes squarely within the generally accepted definition of a 'concession,' and I can find no authority for the position that a concession cannot be granted by lease as well as by other forms of written instruments. * * *

"The question here is, of course, what did the legislature intend? Usually it is presumed to intend the ordinary meaning of the words used. The ordinary meaning of the word 'concession,' as evidenced by the dictionary definitions, embraces the uses made by Fred Harvey and Northern Air Service. The ordinary meaning of the words used are entirely consistent with the intention of the legislature as evidenced in an earlier statute, the 1945 aeronautics act wherein the legislature authorized a political subdivision establishing an airport 'to confer the privilege of concessions.' * * *

"From the language of the section, as amended, counsel infer that there is a distinction between 'leases' and 'grants of privileges of concessions.' And further infer that the legislature intended that the grant of the privilege of concession cannot be made by lease.

"If the legislature so intended, it chose a very complicated method of indicating its intention, that is, requiring the making of an inference upon another inference, when it could have made its intention clear and unequivocal in a few words. I can find no reason for drawing such an inference. * * *

"There is nothing in this language that indicates any intention to require the concession to be granted by some form of grant other than a lease. To the contrary, there is indicated the intention to except concessions granted by lease, loan or otherwise."

Subsequent to our September 1968 decision of *City of Detroit* v. *Tygard*, 381 Mich 271, this Court granted the request that the parties to this litigation be allowed to submit additional briefs as to what extent, if any, that decision should control this decision.

Defendants Tygard were granted possession of certain T-hangars under a written agreement with the Detroit aviation commission, an agency of the city of Detroit, to hold and use the property on a month-to-month basis, terminable with or without cause by the city.

The same taxation statute that is under consideration in this present appeal, was considered and construed as this Court affirmed the trial court's order granting summary judgment to plaintiff city of Detroit in its action against defendants to collect unpaid taxes.

In deciding that defendants should pay the taxes, this Court commented on the fact that the question was one of first impression, that the act did not define the meaning of "concession" as that term was used by the legislature, and approved a dictionary definition of concession as (p 275):

" 'A privilege or space *granted or leased* for a particular use within specified premises.' " (Emphasis ours.)

Emphasizing that the factual situation created by the agreement there under consideration was all-important and that the opinion was confined to the City of Detroit-Tygard agreement, this Court stated (p 277):

"By our holding here we express no opinion upon the merits of any case now pending under the same statute, nor upon any factual situation created by agreements different from those which are in force between appellants and the Detroit aviation commission, acting for the city of Detroit."

The factual situation created by the City of Detroit-Tygard agreement is not similar to the situation in the present appeal, and our decision in that case does not control our decision in this appeal.

Both the 20-year Harvey lease and the 30-year Northern lease contain provisions that fully met the requirements of the aeronautics code of the State of Michigan, which provided that:

"Such terms, charges, rentals and fees shall be equal and uniform for the same type of facilities provided, services rendered or privileges granted with no discrimination between users of the same class for like facilities provided, services rendered or privileges granted."

The *City of Detroit-Tygard* decision established that the agreement there considered failed to meet those requirements.

The privileges granted under the leases to Fred Harvey and Northern Air Service are concessions and "are entirely consistent with the intention of the legislature as evidenced in an earlier statute, the 1945 aeronautics act wherein the legislature authorized a political subdivision establishing an airport 'to confer the privilege of concessions.'"

We agree with the trial court and affirm its opinion holding that the uses of the property leased by Fred

Harvey and Northern Air Service are concessions and that by PA 1953, No 189 as amended, the property here involved is exempt from taxation.

Affirmed. No costs, a public question being involved.

T. E. Brennan, C. J., and Dethmers, Black, and T. M. Kavanagh, JJ., concurred with Kelly, J.

Adams, J. (*dissenting in part*). I agree with Justice Kelly that the use of the property leased by Fred Harvey is by way of a concession in a public airport, but I do not agree that the use of the property leased to Northern Air Service, Inc., is by way of a concession within the meaning of the statute.

## 1. The Law.

PA 1953, No 189, as amended by PA 1962, No 226 (MCLA § 211.181, Stat Ann 1969 Cum Supp § 7.7 [5]),[1] was considered by this Court in *City of Detroit v. Tygard* (1968), 381 Mich 271. In that case, this Court, by a unanimous decision, undertook to define the meaning of "concession," as that term was used by the legislature and treated the question as one of first impression.

*Tygard,* in interpreting the statute, held:

(1) A concession is something more than the mere leasing, renting or otherwise making available real property to a private individual, association, or cor-

---

[1] "When any real property which for any reason is exempt from taxation is leased, loaned or otherwise made available to and used by a private individual, association or corporation in connection with a business conducted for profit, except where the use is by way of a concession in or relative to the use of a public airport, park, market, fairground or similar property which is available to the use of the general public, the lessees or users thereof shall be subject to taxation in the same amount and to the same extent as though the lessee or user were the owner of such property."

poration in connection with a business conducted for profit.

(2) A concession embraces the concept of exclusivity but this concept alone is not controlling.

(3) A concession embodies specific obligations on the part of the privileged party to maintain particular services at specified times.

(4) A concession imposes on the concessionaire the assumption of a responsibility to perform a service customarily or needfully required in the operations to which the concession pertains.

## 2. A General Description of the Leases.

In 1964, Kent county completed a new airport situated partially in the city of Grand Rapids and partially in the township of Cascade. As a part of the overall plan, the Kent county aeronautics board entered into a lease on October 26, 1962 with Northern Air Service, Inc., a Michigan corporation. Under this lease and a supplemental agreement of May 6, 1963, the board agreed to rent to Northern 10 acres owned by the county which was a part of the airport and terminal project. Lessor agreed, subject to obtaining adequate financing, to construct on the tract capital improvements consisting of an aircraft hangar, aircraft T-hangars, offices and related buildings and improvements with adjacent paved apron areas for aircraft and a paved or gravelled parking area. Plans and specifications were subject to lessee's approval. Term of the lease was to be 30 years with a conditional right in lessee to lease for an additional term.

Lessee covenanted to pay as rent sums constituting (a) capital improvement rentals sufficient to retire the principal and interest on the revenue bonds to be issued by the county as they matured; (b) specified ground rental; and (c) a gallonage fee

on gasoline, jet fuel, or other aircraft fuel, plus an additional fee on amounts dispensed by lessee in excess of 500,000 gallons in any calendar year.

Lessee was granted the exclusive use of the 10 acres for the conduct of its business of air service including, generally, repairing, maintaining, servicing, testing, parking, and storing aircraft of lessee or any customer or invitee of lessee; a flight school; the sale, lease, or exchange of aircraft, engines, accessories, and supplies; and the handling of air freight transported for hire in planes owned or operated by lessee.

On August 30, 1963, the aeronautics board entered into a lease agreement with Fred Harvey, a New Jersey corporation. The lease made reference to the fact that lessor was in the process of constructing the airport terminal building complex for the use, service, and convenience of the public and recited that lessee desired the privilege of operating the restaurant, merchandise, and motel concessions in the complex to provide services for the use and benefit of the public using the airport. The premises rented to lessee were separately designated in the lease as "restaurant and merchandise concession space" and "motel concession site," with motel to be constructed by lessor. The initial term of the lease was 20 years with the provision that the grant and lease of the premises was for the exclusive use of the lessee. Subject to obtaining adequate financing, lessor agreed to complete the terminal building complex for use as a public airport and to construct upon the leased premises capital improvements, including facilities for the restaurant, merchandise, and motel concessions in accordance with plans and specifications to be approved by lessee.

The lease agreement bound lessee to pay rent computed by a percentage of lessee's total gross receipts derived from food sales, alcoholic beverages,

motel rooms, and merchandise sales, under formulas
spelled out in the lease with a requirement for pay-
ment of a minimum annual rent.

### 3. Detailed Analysis of the Leases.

From the foregoing general description of the
Northern and Harvey leases, it would appear that
they are essentially comparable, so that, if one is a
concession, the other must be also. This portion
of this opinion will deal with the dissimilarities
between the operations and use under the two leases
which lead me to a contrary conclusion. In making
this analysis, the four tests of *Tygard* will be applied
to each lease. Attached to this opinion as an ap-
pendix is an abstract of the pertinent provisions
of the leases to which reference should be made to
establish the differences now to be noted. Citations
to the Northern lease are preceded with an "N" and
citations to the Harvey lease by an "H," followed
in each instance by the roman numeral of the article
of the lease in which the pertinent language appears.

*Tygard Test No 1:  More Than A Mere Leasing
       Required.*

Northern's lease is of a 10-acre tract for the pur-
pose of carrying on several businesses. (N–I).
None of those businesses is essential to the enjoy-
ment and use of the airport by the general public.
The operations of Northern are like those of a busi-
ness operating in a shopping center, such as a drug-
store. The 10 acres are rented exclusively but with
enjoyment in common with other businesses at the
airport (even another flight school, aircraft sales
agency or air freight business) of such appurte-
nances as parking areas and related facilities.
Northern's uses under the lease are confined to the
10-acre tract except for ingress and egress over

airport property. (N–I). Harvey's uses, as will be hereinafter noted, include numerous ones that extend to the whole airport facility, not just the demised premises.

Northern was given the right to construct or install at its own expense any buildings, structures, or improvements, including underground storage tanks, deemed appropriate for use in connection with its air service operations. (N–VI). The lessor has a limited right of prior approval of plans and specifications. By supplemental agreement, both the lessor and lessee are required to obtain the prior written consent of the Federal aviation agency. No restriction is placed upon Northern as to architects, builders or contractors who may be employed by Northern in connection with any alteration, repair or maintenance of any such improvements. (N–VI).

In contrast, the Harvey lease provides that title to all property of every sort which may be installed by Harvey as a replacement or addition to property furnished by lessor shall immediately vest in the lessor. (H–XIII). Harvey agrees that it will adopt and use decorating schemes and motifs in harmony with the design and architectural treatment of the terminal building and that it will submit the same, including any proposed changes, for prior approval. (H–XIII). Under its agreement, Harvey is to make no structural changes in or about the leased premises without the prior written consent of the lessor. (H–VIII).

*Tygard Test No 2: Concept of Exclusivity.*

Northern was granted the exclusive use only of the premises demised to it.[2] (N–I). There is no

---

[2] A restriction on exclusive use is exacted by the Federal aviation act of 1958 (49 USC § 1349), which provides:

"There shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended."

restriction upon the lessor which would prevent it from leasing another 10-acre tract to another tenant for precisely the same businesses carried on by Northern.

In contrast, Harvey was granted the exclusive right to operate a food and beverage service (H–XII), the exclusive right to operate a motel on the airport and on any property owned by lessor within 1,000 feet of the airport (H–XII), the exclusive right to operate a merchandise concession and newsstand in the terminal building (H–XII), the exclusive right (subject to certain specified exceptions) to operate merchandise, food, and beverage vending machines on the airport. (H–XII).

Lessor further covenants with Harvey not to divert business from lessee's operations, that no courtesy cars shall be permitted to solicit at the airport for hotels or motels and that it will not permit direct telephone lines at the airport to other hotels or motels located within 8 miles of the terminal building. (H–XII). Harvey is granted the right to install a direct telephone line between its motel and the terminal building lobby. (H–I).

Northern is granted the right to operate certain businesses upon the property leased by it, such right being exclusive only as to the leased premises. Harvey is granted similar exclusive use of the premises leased to it and, in addition, every effort is made in the Harvey lease to assure Harvey exclusive rights of operation upon all airport property as well as any other property owned by lessor within 1,000 feet of the airport as to motel, food and beverage service. (H–XII). Harvey is granted the right to display restaurant and beverage menus in a conspicuous place in the public area of the terminal building, the right to use terminal building conference rooms, the right to erect signs, parking priv-

ileges, and is given a commitment by lessor not to divert business from the lessee. (H–XII).

*Tygard Test No 3: Concept of Specific Obligations to Maintain Particular Services on the Part of the Privileged Party.*

While Harvey by its lease is held to many specific standards in its operations ranging all the way from hours to personnel (H–XIII), there are none whatsoever in the Northern lease. Harvey agrees it will at all times provide personnel sufficient to operate the leased facilities on a standard equal to that maintained by comparable restaurant, concession, and motel operations at comparable locations. (H–XIII). Restaurant employees are required to wear uniforms. (H–XIII). Harvey is not to maintain in its employ any personnel whose conduct the lessor finds to be detrimental to the proper operation of the airport. (H–XIII). Harvey agrees to keep the coffee shop, the merchandise concession and newsstand, dining room and bar and cocktail lounge open for business during such hours as may be required to meet the reasonable demands for service. (H–XIII). Harvey is required to provide breakfast, lunch, and dinner service 7 days a week at least from 7:00 a.m. to 9:00 p.m. and to provide a minimum food service during the entire 24 hours of each day. (H–XIII). Harvey agrees the motel shall be open 24 hours a day. (H–XIII). *No similar service requirements appear in the Northern lease.*

Under the Northern lease, lessor may adopt reasonable rules and regulations for the safety of those using the airport and Northern agrees to observe and obey: provided, that such rules and regulations are consistent with rules and regulations of the Federal aviation agency with respect to aircraft operations at the airport and are not inconsistent with procedures prescribed or approved by such

agency with respect to the operation of Northern's own aircraft at the airport. (N–XI).

Under Harvey's lease, lessee agrees to observe and obey rules and regulations of lessor which are general in application to all users of the airport or terminal building and further agrees to comply with all laws, ordinances, rules, and regulations of Federal, State, county, and municipal governments relating to its occupancy of the leased premises and to obtain and keep in effect all licenses, permits, and other certificates required for the operation of its business under the lease. (H–XI). Superimposed are lessor's own requirements like in H–II, where lessor retains the absolute discretion to prohibit and control printed matter for sale at the merchandise concession and newsstand to be operated by Harvey. As to prices, Harvey agrees to keep its prices competitive. (H–XIII). Northern is unrestricted except as to charges covering hangar rental fees, tie-downs, and fuel which are to be determined by arbitration in the event of disagreement with lessor as to reasonableness. (N–XVI).

*Tygard Test No 4: Performance of a Service Customarily or Needfully Required in the Operation of an Airport.*

The preamble of the Harvey lease states:

"Lessee desires the privilege of operating the restaurant, merchandise and motel concessions in said terminal building complex to provide thereon and therein the services hereinafter set forth *for the use and benefit of the public using said airport.*" (Emphasis added.)

The grant in said lease speaks specifically of "the privilege of operating restaurant, merchandise and motel concessions."

In the Northern lease there is no mention in the preamble of service to the public. The significant wording is:

"Lessee desires to lease certain premises and the hangar facilities to be constructed at the airport * * * and to obtain certain rights and privileges with respect thereto on the airport. * * *

"Lessee is engaged in the business of sales and servicing and repair of aircraft, storage of aircraft, student training, charter flights, and other activities necessarily related thereto."

The businesses conducted by Northern while not uncommon to the operations of an airport are not operations needful to or utilized by the general public. Restaurants, merchandise, and motel facilities, on the other hand, are services required by the general public.

### Conclusions Drawn from Tygard's Tests.

Aside from the limited authority reserved by lessor relating mainly to regulation of the overall operation of the airport, the Northern lease has the effect of turning over the leased premises to Northern for such use as it may elect to make of it in conducting its business of air service. Controls imposed in the Harvey lease and obligations assumed by Harvey show the grant to be of space within the airport and terminal for conducting a subsidiary business and service therein relative to the public use of the airport property. Harvey's operations are a type of use similar to concessions at a park, market, or fairground. Northern's operation, on the other hand, is a private business operation from rented premises contiguous to an airport and lacks the quality of necessary and needful service for the public use of an airport.

4. Construction of a Tax Statute.

The purpose of the tax statute here under consideration is to tax the use of real property otherwise exempt from taxation which property has been leased, loaned, or otherwise made available to and is used by a private individual, association or corporation in connection with a business conducted for profit. The statutory exception from the tax covers a concession not only in or relative to the use of a public airport, but also a *park, market, fairground or similar property which is available to the use of the general public.* The statute imposes no time period for the term of the concession. It is the use and not the duration which is controlling. From the very fact that many such concessions are temporary grants of privileges for the duration of a fair, or a season, it would seem evident that the legislature had in mind such grants of privilege as would not be readily taxable either because the privilege would be of short duration (less than the normal one-year tax period) or the use would be one that could not be readily appraised for tax purposes.

The exemption in a tax statute will be strictly construed. *City of Detroit* v. *Detroit Commercial College* (1948), 322 Mich 142; *Evanston Y.M.C.A. Camp* v. *State Tax Commission* (1962), 369 Mich 1. Only if the tests laid down by this Court in *Tygard* are clearly met should the exception be recognized. Unless this is done, the exception will become the rule and equality of taxation, which is the purpose of the statute, will be defeated.

I vote to affirm the decision of the trial court in the case of County of Kent and Michigan Airport Managers Association v. City of Grand Rapids. I vote to reverse the decision of the trial court in the case of Northern Air Service, Inc., and Michigan

Airport Managers Association *v.* Township of Cascade and Caledonia Community Schools of Kent, Allegan and Barry Counties.

T. G. KAVANAGH, J., took no part in the decision of this case.

## APPENDIX

*Fred Harvey lease.*

## "LEASE AGREEMENT.

"This indenture of lease, made and entered into this 30th day of August, 1963, by and between the Kent county aeronautics board, acting for and on behalf of the county of Kent, Michigan (hereinafter called 'lessor'), and Fred Harvey, a corporation organized and existing under the laws of the State of New Jersey, with its principal office at 80 East Jackson Boulevard, Chicago 4, Illinois (hereinafter called 'lessee') :

## "WITNESSETH:

"Whereas lessor is constructing and will own and operate an airport known as the Kent county airport (Cascade), with the power to lease premises and facilities and to grant rights and privileges with respect thereto, pursuant to the provisions of the aeronautics code of the State of Michigan (PA 1945, No 327, as amended) ; and

"Whereas lessor is in the process of constructing or causing to be constructed, without expense to lessee, the airport terminal building complex at said airport for the use, service, and convenience of the public making use of the airport services and facilities, the site plan for which terminal building complex is shown on the drawing attached hereto and marked exhibit 1 and

"Whereas lessee is engaged in the business of operating restaurant, merchandise and motel concessions, and is capable and experienced in said business; and

"Whereas lessee desires the privilege of operating the restaurant, merchandise and motel concessions in said terminal building complex to provide thereon and therein the services hereinafter set forth for the use and benefit of the public using said airport, and upon the terms and conditions hereinafter provided; and

"Whereas lessee has examined the plans for the construction of said terminal building complex, including plans for the parts thereof hereinafter described to be occupied by lessee, and does approve the same; and

"Whereas lessor is willing to permit lessee to occupy the parts of said terminal building complex and to operate the facilities hereinafter set forth;

"Now, therefore, for and in consideration of the premises and the mutual covenants and agreements herein contained, and other valuable consideration, lessor does hereby grant to lessee the privilege of operating restaurant, merchandise and motel concessions herein set forth and does demise and let unto lessee, and lessee does hereby hire and take from lessor, certain premises and facilities, rights, licenses, services and privileges hereinafter described, in connection with and upon the said airport.

"Article I. Premises.

"Lessor does hereby demise, lease, and grant to lessee, for lessee's exclusive use, and lessee does hereby hire and take from lessor the premises herein designated restaurant and merchandise concession space and motel site, being more particularly described as follows:

"*Restaurant and merchandise concession space:* Those certain premises situated in the terminal

building consisting of 1,367 square feet of space located in the basement, 4,878 square feet of space located on the first floor, and 2,344 square feet of space located on the second floor of the terminal building, and outside storage areas for garbage, trash and leach containers to be used jointly with other occupants of said building, said premises being designated on certain exhibits marked exhibits 2, 3 and 4 attached hereto and made a part hereof; together with the right and privilege through the public areas of said building and over and across the public areas adjoining said building for ingress to and egress from said leased space for lessee's employees, agents and customers.

*"Motel concession site:* All that part of the southeast quarter of section 19, town 6 north, range 10 west, Kent county, Michigan, described as follows:

"Commencing at the south 1/4 corner of section 19, town 6 north, range 10 west, Cascade township, Kent county, Michigan, north 88°37′ east 788.16 feet along the south line of said section, thence north 1°23′ west 108.0 feet, thence north 1°23′ east 500.0 feet, thence north 62°25′ east 346.14 feet, to the place of beginning, thence north 36°13′ east 585.45 feet, thence south 53°47′ east 500 feet, thence south 36°13′ west 585.45 feet, thence north 53°47′ west 500 feet to the place of beginning,

"(as shown on exhibit 5 attached hereto and made a part hereof), together with such capital improvements as shall be constructed or caused to be constructed therein by lessor for the exclusive use of lessee, and together with the right to install, at lessee's expense, a direct line telephone between said motel and a location in the terminal building lobby mutually satisfactory to lessor and lessee.


"ARTICLE II. USE OF PREMISES.

"Lessee, subject to the terms and provisions hereof, shall have the right to use the demised premises

for any and all purposes in connection with the conduct by lessee of its business on such premises, including, without limitation the following uses and purposes:

"1. The right to operate a general restaurant business serving food and beverages in and from the spaces designated therefor on said exhibits 3 and 4.

"2. The right to cater in said restaurant space banquets, receptions, and other similar functions, provided that restaurant service to the general public shall not be impaired thereby.

"3. The right to prepare and sell inflight meals for consumption aboard scheduled commercial aircraft, provided that nothing in this lease shall be construed to give lessee any exclusive right, franchise or privilege with relation thereto, it being understood that the operators of said aircraft are not restricted by lessor to dealing with lessee.

"4. The right to conduct and operate a retail general merchandise concession, including gift shop and newsstand, in the space designated therefor on said exhibit 3, including the right to stock and sell items generally sold in general merchandise concessions in airports and railway terminal buildings, including but not limited to the following: books, paper backed books, newspapers, magazines; candy, gum; tobacco articles, smoking accessories; toys; costume jewelry; gift items; toilet articles, cosmetics and patent medicines of type commonly sold at such concessions; photographic equipment and supplies; novelties; soft goods of type commonly sold at such concessions, including handkerchiefs, neckties, scarves, gloves, and stockings; provided that lessor, acting through its director of aeronautics, shall have the absolute discretion under the lease to prohibit and control sale of printed matter which it may consider not to be desirable for sale at such location.

"5. The right to operate a general motel business for the accommodation of airline and general avia-

tion aircraft passengers, crews, and personnel who are emplaning, deplaning or are waiting between flights at the airport, and for the general public. Lessee shall have the right to serve continental type breakfasts to motel guests with or without charge.
\* \* \*

### "Article VIII. Repair, Maintenance and Operation by Lessee.

"Except as provided in article VII hereof, lessee shall keep and maintain the premises hereunder leased to lessee, and all such improvements and facilities and additions thereto constructed or installed by it or by lessor upon premises hereunder leased to it for its exclusive use, in good condition and repair, reasonable wear and tear excepted. Lessee shall make no structural changes in or about the leased premises or structures without the prior written consent of the lessor, but such consent shall not be unreasonably withheld.

"Lessee shall keep the premises hereunder leased to it for its exclusive use in a sanitary and sightly condition and shall provide all janitor services with respect thereto. Lessee shall provide for the sanitary handling and disposal of trash and other refuse in a manner satisfactory to lessor.

"Lessee shall not deposit nor permit to be deposited in the airport sewerage system any substance which would be injurious to said system or its efficient operation, but said system will be designed to handle waste, including food waste, from a normal restaurant and motel operation.

"In the event that lessee fails to perform, for a period of 30 days after written notice from lessor so to do, any obligation required by this article VIII to be performed by lessee at lessee's cost, lessor, upon the expiration of such 30 day period, may, but shall not be obligated to, enter upon the premises involved and perform such obligation of lessee, charging the lessee the reasonable cost and expense

thereof, and lessee agrees to pay lessor such charge in addition to any other amounts payable by lessee hereunder; provided, however, that if lessee's failure to perform any such obligation adversely affects or endangers the health or safety of the public or of employees of lessor, and if lessor so states in its aforesaid notice to lessee, lessor may, but shall not be obligated to perform such obligation of lessee at any time after the giving of such notice and without awaiting the expiration of said 30 day period, and charge to lessee, and lessee shall pay, as aforesaid, the reasonable cost and expense of such performance. It is further agreed that if lessor shall perform any of lessee's obligations in accordance with the provisions of this section, lessor shall not be liable to lessee for any loss of revenue to lessee resulting from such performance. * * *

"Article XI. Laws, Ordinances, Regulations, Licenses, Permits.

"Lessor shall adopt and enforce reasonable rules and regulations and any reasonable amendments with respect to the use of the airport, including the terminal building, which shall provide for the safety of those using the airport, including the terminal building, and which shall be for the benefit and protection of all persons and firms having places of business at said airport, and lessee agrees to observe and obey the same; provided that the rules shall be general in their application to all users of such airport or terminal building, and shall not contravene the provisions of this lease agreement.

"Lessee agrees that it will comply with all laws, ordinances, rules and regulations of Federal, State, county and municipal governments and agencies thereof relating to its occupancy of the demised premises and will obtain and keep in effect all licenses, permits and other certificates required thereby for the operation of its business hereunder.

"Article XII.  Covenants by Lessor.

"Lessor further covenants and agrees as follows:

"1. Subject to any restriction on lessor's legal right to grant the same, lessee shall have the exclusive right to operate a food and beverage service and a motel on the airport and within any property owned by lessor within 1,000 feet of the airport, and to operate a merchandise concession and newsstand in the terminal building; excepting, however, in-flight food service to airlines and excepting food service operated by industries located on the airport solely for their own employees. Lessor agrees that it will not grant to any third party the right to provide in-flight food service at a lesser rental than lessee is obligated to pay hereunder.

"2. Lessee shall have the exclusive privilege of operating merchandise and food and beverage vending machines on the airport directly or through independent contractors, except the following: coffee vending machines in facilities leased to Northern Air Service, Inc., mechanical valets, and insurance vending machines; provided, that lessee shall install and operate such merchandise and food and beverage vending machines (except as above provided) as lessor or other occupants of said airport may reasonably request and that can be operated profitably. It is agreed that the privileges granted to lessee hereunder are not intended to apply to other than merchandise and food and beverage vending machines and specifically not to apply to game machines to be located in lessor's game room or to coin operated lockers.

"3. Lessee shall have the right to display its restaurant and beverage menus in a conspicuous place in the public area of the terminal building, at locations to be acceptable to lessor and lessee.

"4. Lessee shall have the privilege of use of lessor's conference rooms on the second floor of the terminal building adjoining the leased dining room space at any time when said conference rooms are not scheduled for use by lessor.

"5. Lessor will not authorize or permit the installation of other concessions which obstruct the entrance to the restaurant or other space occupied by lessee hereunder.

"6. Lessee may erect, within the terminal building and on the airport complex, signs identifying lessee's business which are acceptable to lessor and in harmony with the architectural treatment of the airport complex and at locations approved by the department of aeronautics.

"7. Lessor agrees to reimburse lessee for all damage to property of lessee at the airport caused by the wrongful or negligent act or omission of lessor's employees, agents or contractors.

"8. Lessor agrees to make available to guests of the restaurant operated by lessee hereunder for periods of not to exceed 3 hours and to lessee's employees during working hours free parking at the lot adjoining said terminal building, whether operated by lessor or by a concessionaire. Lessee agrees that such free parking shall be only for guests making purchases totaling 75¢ or more and shall require validation of parking lot checks by lessee. Lessee agrees that free parking to employees shall be available only upon the basis of employee identification cards to be issued jointly by lessor and lessee and that lessor may require a reasonable deposit for each such card. Lessee agrees to pay the cost of administrative overhead to lessor or its parking lot concessionaire resulting from this privilege of free parking not to exceed $25 per month.

"9. Lessor agrees not to divert business from the operations to be conducted by lessee hereunder. Lessor agrees that no courtesy cars shall be permitted to solicit on the airport on behalf of other motels or hotels operated by third parties. Lessor further agrees that it will not permit the installation at the airport of any direct telephone lines to any motel (other than that to be operated by lessee hereunder) or hotel located within 8 miles of the terminal building.

"Article XIII.   Covenants by Lessee.

"Lessee further covenants and agrees as follows:

"1. Except as herein specifically set forth to be furnished by lessor, lessee shall furnish at its expense all service equipment of every sort (such as silver, linen, glassware, crockery and utensils) which may be required for use in lessee's operations hereunder.   Title to such service equipment shall remain in lessee.

"2. Title to all property of every sort which may be installed by lessee as a replacement for or as an addition to property furnished by lessor under the terms of this agreement shall immediately vest in lessor after its installation.

"3. Lessee agrees to keep its personal property used on or about the leased premises free and clear of all liens and in the event that any claims of lien are filed against such property to remove the same within 90 days after the same may be filed or to provide lessor with a bond in sufficient amount and on terms acceptable to lessor, guaranteeing the removal of such lien.

"4. Lessee shall at all times provide personnel sufficient to operate the leased facilities on a standard equal to that maintained by comparable restaurant, concession and motel operations at comparable locations.   Lessee will not maintain in its employ any personnel whose conduct lessor finds to be detrimental to the proper operation of the airport. All employees shall be neat and clean in their appearance at all times.   All restaurant employees shall wear uniforms.

"5. Lessee agrees that it will adopt and use decorating schemes and motifs in harmony with the design and architectural treatment of the terminal building and will submit the same, including any proposed changes therein, to the department of aeronautics for its approval prior to installation.

"6. Lessee agrees to keep the coffee shop, the merchandise concession and newsstand, dining room and

bar and cocktail lounge open for business during such hours as may be required to meet the reasonable demands for said services.   Lessee shall provide breakfast, lunch and dinner service 7 days a week at least from 7:00 a.m. to 9.00 p.m. and shall provide a minimum food service during the entire 24 hours of each day.   Such minimum service may consist of offering food only through vending machines.   Lessee agrees to keep the motel open for 24 hours during each day.

"7. Lessee agrees that it will maintain the motel site in good condition and appearance and will keep the drives, walks and motel parking lot free and clear of snow and in good and safe condition.   Lessee agrees that the motel parking lot shall be used only by registered guests of the motel, or their visitors, immediate prospective guests, persons employed at the motel, and suppliers doing business at the motel.

"8. Lessee agrees that it will not directly or through a subsidiary or enterprise affiliated with lessee operate competitive restaurant or motel facilities within 8 miles of the airport terminal building without the prior approval of lessor.

"9. Lessee agrees that the prices charged for all food, beverages and other merchandise sold on the demised premises shall be competitive with the established prices charged by similar restaurants, gift shops and other businesses selling like quality and quantities of similar food, beverages and merchandise and providing similar services.

"10. Lessee agrees to reimburse lessor for all damage to property of lessor at the airport caused by the wrongful or negligent act or omission of lessee's employees, agents or contractors or arising out of lessee's use or occupancy of the leased premises.

"11. Lessee agrees that (a) it will not permit nor suffer to remain upon said motel site any obstruction that extends above the height of the building to be constructed by lessor hereunder without the

written approval of lessor and of the Federal aviation agency, and that (b) it will not permit or suffer use of the leased premises in such a manner as to create electrical interference with radio communication or navigation aids between the installation upon the airport and aircraft and that (c) it will not install or maintain outside lighting except of a type approved by the department of aeronautics as not making it difficult for flyers to distinguish between airport lights and others, as not resulting in glare in the eyes of flyers using the airport, as not impairing visibility in the vicinity of the airport, and as not otherwise endangering the landing, taking off or maneuvering of aircraft.  Further, there is agreed to be reserved by lessor for the use and right of the public using said airport the right to cause in the air space above said airport such noise as may be inherent in the operation of aircraft now or hereafter used for navigation of or flight in air, using said air space or landing at, taking off from or operating on said airport."

*Northern Air Service, Inc., lease.*

## "BUILDING AND SITE LEASE.

"This indenture of lease, made and entered into this 26th day of October, A.D., 1962, by and between the Kent county aeronautics board, acting for and on behalf of the county of Kent, Michigan (hereinafter called 'lessor'), and Northern Air Service, Inc., a corporation organized and existing under the laws of the State of Michigan (hereinafter called 'lessee'), with principal offices located at Grand Rapids, Michigan;

### "WITNESSETH:

"Whereas lessor is constructing and will own and operate an airport known as the Kent county air-

port, located in Cascade township in the county of Kent, State of Michigan (hereinafter called the 'airport'), with the power to lease premises and facilities and to grant rights and privileges with respect thereto, pursuant to the provisions of the aeronautics code of the State of Michigan (PA 1945, No 327, as amended); and

"Whereas lessor shall be obligated to use its best efforts to construct or cause to be constructed without expense to lessee capital improvements consisting of an aircraft hangar building, aircraft T-hangars and adjacent paved apron and service areas, for the exclusive use of lessee, upon the building site it is willing to lease to the lessee, said capital improvements to be constructed in accordance with plans and specifications prepared by J. & G. Daverman Company, architects and engineers of Grand Rapids, Michigan, approved by the lessee; and

"Whereas lessee desires to lease certain premises and the hangar facilities to be constructed at the airport as shown on exhibit A, attached hereto and hereby made a part hereof, and to obtain certain rights and privileges with respect thereto on the airport upon the terms and conditions hereinafter provided; and

"Whereas lessee is engaged in the business of sales and servicing and repair of aircraft, storage of aircraft, student training, charter flights, and other activities necessarily related thereto (hereinafter referred to as "air service");

"Now, therefore, for and in consideration of the premises and the mutual covenants and agreements herein contained, and other valuable considerations, lessor does hereby grant, demise and let unto lessee, and lessee does hereby hire and take from lessor, certain premises and facilities, rights, licenses, services and privileges hereinafter described in connection with and upon the airport.

"ARTICLE I. PREMISES.

"Lessor does hereby demise, lease and grant to lessee, for lessee's exclusive use, and lessee does hereby hire and take from lessor, the premises consisting of a parcel of land (hereinafter sometimes referred to as "building site"), consisting of 10 acres, described as:

"All that part of the northeast 1/4 of section 30, town 6 north, range 10 west, Cascade township, Kent county, Michigan, described as:

"Commencing at the north 1/4 corner of said section, thence north 88°37' east 749.51 feet along the north line of said section, thence south 1°23' east 356.06 feet perpendicular to said north line to the place of beginning of this description, thence north 81°13' east 709.0 feet, thence south 8°47' east 383.5 feet, thence north 81°13' east 117.0 feet, thence south 8°47' east 350.0 feet, thence north 81°13' east 21.0 feet, thence south 8°47' east 120.0 feet to intersect a line that is 1,102.50 feet northerly of and parallel with the centerline of the main east-west runway, said runway has a bearing of north 81°13' east, thence south 81°13' west 278.0 feet, thence north 8°47' west 418.5 feet, thence south 81°13' west 692.0 feet, thence north 8°47' west 90.0 feet, thence north 81°13' east 123.0 feet, thence north 8°47' west 345.0 feet to the place of beginning,

"together with any capital improvements consisting of aircraft hangar building, aircraft T-hangars and adjacent paved apron and service areas, as may be constructed or caused to be constructed thereon by the lessor for the exclusive use of lessee.

"Lessee is hereby granted the exclusive use of the demised premises, described above, subject to the terms and provisions hereof, for any and all purposes in connection with the conduct by lessee of air service, including, without limitation, the following uses and purposes:

"(1) The right to repair, maintain, condition, service, test, park or store aircraft or other equip-

ment of lessee, or any customer or invitee of lessee, within the lessee's building site area and in such other areas as are designated by the lessor;

"(2) the right to conduct a flight school, subject to rules and regulations as promulgated under article XI hereof, on the airport;

"(3) the right to sell, lease, dispose of or exchange aircraft, engines, accessories and supplies;

"(4) the right, subject to the terms and conditions hereof, to purchase or otherwise obtain personal property of any nature (including aircraft, engines, accessories, gasoline, oil, greases, lubricants, other fuel or propellant, other equipment and supplies and any articles or goods) reasonably necessary or convenient for its operations, from any supplier of its choice; Provided that foods, confections, soft drinks, cigarettes and other items generally dispensed by a restaurant or merchandise concession shall be dispensed only through vending machines made available through lessor, except that lessee may operate coffee vending machines for its employees' use in areas not customarily open to the public.

"(5) the right to service aircraft or other equipment of lessee, its customers and invitees, by truck or otherwise, with gasoline, oil, greases, lubricants or any other fuel or propellant or other supplies;

"(6) the right to taxi, tow, park, load and unload lessee's aircraft and other equipment used in the operation of charter, courtesy, test, training, inspection, emergency, special, sightseeing and other flights;

"(7) the right to install and operate, at lessee's expense, a reasonable number and type of company identification signs, subject to the prior written approval of lessor as to form, type and location; and such signs installed by lessee shall be maintained in good condition and appearance and if electrical shall be so designed, maintained and operated as not to constitute a hazard to navigation or to interfere with radio or other equipment used on or about said airport by the Federal aviation agency or others;

"(8) the right to install, maintain and operate, at lessee's expense, such radio communications, meteorological and aerial navigation equipment and facilities as may be necessary or convenient in the opinion of lessee for its operation: Provided, however, that no installation, maintenance and operation by lessee shall interfere with the operation of other radio communications, meteorological and aerial navigation equipment and facilities maintained or operated in or about said airport by the Federal aviation agency or any other authorized persons and shall not conflict with or be contrary to the Federal, State or county rules, regulations or policies;

"(9) the right to transfer, load and unload persons, cargo and property to, from and at the leased premises on the airport and incidental to its air service business by such loading and unloading devices, motor cars, buses, trucks or other means of conveyance as lessee may choose or require in the operation of its air service business; Provided that lessee shall not act as agent for others for either the receipt and forwarding of outgoing air freight or for the receipt and delivery of incoming air freight, transported by commercial air freight carriers; but this provision shall not prevent lessee from picking up, carrying and delivering air freight carried for hire in planes owned or operated by it;

"(10) the right to conduct operations or activities other than those enumerated in subparagraphs (1) to (9) inclusive, of this paragraph, reasonably related to the landing, taking off, flying, moving, loading, unloading, or servicing of aircraft which are reasonably necessary or convenient to the conduct by it of air service: Provided, however, that all such other operations and activities shall be subject to the approval of the lessor.

"Subject to the reasonable rules and regulations promulgated by lessor in accordance with article XI hereof, lessee shall have the right and privilege on, over and across the airport of ingress to and egress from the premises and facilities described in this

article I for its employees, agents, passengers, guests, patrons and invitees, its or their suppliers of materials and furnishers of service, its or their aircraft, equipment, vehicles, machinery and other property; Provided, that lessor is not hereby prevented from granting exclusive or nonexclusive licenses to others covering the furnishing of services of a type reasonably subject to such control by lessor and not basically a part of lessee's operations, including but not limited to taxicab and/or limousine service, provided that lessor's control of such service shall not impair service to lessee. Except for aircraft landing fees and automobile parking fees, and except as herein otherwise specifically provided, no charges, fees or tolls of any nature, direct or indirect, shall be imposed by lessor upon lessee, its employees, agents, passengers, guests, patrons and invitees, its or their suppliers of materials and furnishers of service, for such right of ingress and egress, or for the privilege of purchasing, selling or using any materials or services furnished or otherwise obtained by lessee.    *    *    *

"ARTICLE VI. CONSTRUCTION BY LESSEE
UPON BUILDING SITE.

"Lessee shall not construct any buildings or facilities on said premises which conflict with the airport master plan of said airport as existing at such time and as on file with FAA. Subject to such restrictions lessee, at its own expense, may construct or install (in accordance with applicable laws and ordinances, local rules and regulations and applicable runway clearance requirements) in or on the building site described in article I hereof, any buildings, structures or improvements, including equipment and underground storage tanks that it shall determine to be appropriate for use in connection with its air service operations: Provided, however, that lessor shall have the right to inspect the plans and specifications of any such buildings, structures and improvements prior to construction or installation

thereof and to refuse to permit such construction or installation if the external appearance thereof does not meet lessor's reasonable requirements for substantial uniformity of appearance of all buildings and structures on the airport, or if the type or time of construction or installation or the location thereof does not meet lessor's reasonable requirements for safe use of the airport and appurtenances by other authorized persons.  Lessee shall have the right to alter, modify, repair and maintain any buildings, structures or improvements constructed or installed on premises leased hereunder, subject to the above restrictions applicable to new construction.  All equipment and methods of handling used by lessee in handling of fuel on the leased premises shall conform to reasonable safety standards established from time to time by lessor.

"Lessor may, at its own cost, inspect any such construction or installation.  If such construction or installation has not been completed in accordance with the plans and specifications therefor approved by lessor, lessor may by written notice demand that the lessee make appropriate changes in such construction or installation, and, if such changes have not been undertaken by the lessee within 30 days of lessor's notice, lessor may, but shall not be obligated to, enter upon the premises involved and perform such obligation of lessee, charging the lessee the reasonable cost and expense thereof, and lessee agrees to pay lessor such charge in addition to any other amounts payable by lessee hereunder. It is further agreed that if lessor shall perform any of lessee's obligations in accordance with the provisions of this section, lessor shall not be liable to lessee for any loss of revenue to lessee resulting from such performance.

"No restrictions shall be placed upon lessee as to the architects, builders or contractors who may be employed by it in connection with the construction, installation, alteration, modification, repair or maintenance of any such buildings, structures or improve-

m'ents, and lessor shall provide free ingress to and egress from the same by routes designated by lessor for all persons, materials or things connected with the construction, installation, alteration, modification, repair or maintenance thereof.   *   *   *

### "Article XI. Rules and Regulations.

"Lessor shall adopt and enforce reasonable rules and regulations and any reasonable amendments thereto with respect to the use of the airport, which shall provide for the safety of those using the airport and lessee agrees to observe and obey the same: Provided, that such rules and regulations shall be consistent with safety and with rules, regulations and orders of the Federal aviation agency with respect to aircraft operations at the airport; and provided further, that such rules and regulations shall not be inconsistent with the procedures prescribed or approved from time to time by the Federal aviation agency with respect to the operation of lessee's aircraft at the airport.   *   *   *

### "Article XVI. Rates and Charges of Lessee. Arbitration.

"Lessee will, on the date of the commencement of the term of this lease, file with the lessor its schedule of rates and charges covering hangar rental fees, charges for tie-downs and charges for fuel.   Any charges, revisions, or additions to the original schedule so filed shall immediately be filed with the lessor. In the event lessor determines any such rates or charges are unreasonable, and no agreement in relation thereto is reached between lessor and lessee, either party may, by notice in writing to the other, submit the controversy or claim to arbitration.   The party desiring such arbitration shall give written notice to that effect to the other party, specifying in said notice the name and address of the person designated to act as arbitrator on its behalf.   Within 15 days after the service of such notice, the other

party shall give written notice to the first party specifying the name and address of the person designated to act as arbitrator on its behalf. The arbitrators thus appointed shall appoint a third disinterested person of recognized competence in such field, and such three arbitrators shall as promptly as possible determine the controversy or claim.

"If the two arbitrators appointed by the parties shall be unable to agree upon the appointment of a third arbitrator within 15 days after the appointment of the second arbitrator, then within 15 days thereafter either of the parties upon written notice to the other party, on behalf of both, shall request the appointment of a disinterested person of recognized competence in the field involved as the third arbitrator by the presiding judge of the circuit court (17th judicial circuit) of the State of Michigan, county of Kent, and the other party shall not raise any question as to the court's full power and jurisdiction to entertain the application and make the appointment.

"The decision in which any 2 of the 3 arbitrators so appointed and acting hereunder concur shall in all cases be binding and conclusive upon the parties. Each party shall pay the fees and expense of the arbitrator appointed by such party and one-half of the other expenses of the arbitration properly incurred hereunder.

"Each of the parties hereto agree that if, in the opinion of the other party, any separate agreement is required by law in order to effectuate or enforce the arbitration provisions hereinabove contained, it will execute such separate agreement, provided that the same is not inconsistent with the terms and provisions of this agreement."

The omitted articles in the *Fred Harvey lease,* with their titles, are as follows:

III–Term; IV–Rent; V–Construction by Lessor upon Building Site; VI–Financing of Capital Im-

provements; VII–Repair, Maintenance, and Opera-
tion by Lessor; IX–Right of Entry by Lessor; X–
Utility Services; XIV–Covenant Against Discrim-
ination in Employment; XV–Insurance; XVI–Dam-
age or Destruction of Premises on Building Site;
XVII–Taxes; XVIII–Cancellation by Lessor; XIX–
Cancellation by Lessee; XX–Suspension and Abate-
ment; XXI–Indemnity; XXII–Surrender of Posses-
sion; XXIII–Mineral Rights; XXIV–Condemna-
tion; XXV–Assignment and Subletting; XXVI–
Right to Lease to the United States Government;
XXVII–Sale of Liquor by Lessee; XXVIII–Notices;
XXIX–Invalid Provisions; XXX–Successors and
Assigns Bound by Covenants; XXXI–Paragraph
Headings; XXXII–Renewal Privilege; XXXIII–
(Recital that foregoing provisions contain entire
agreement).

The omitted articles in the *Northern Air Service
Lease,* with their titles, are as follows:

II–Term; III–Construction by Lessor upon Build-
ing Site; IV–Financing of Capital Improvements;
V–Rental and Fees; VII–Maintenance, Repair and
Operations by Lessee; VIII–Right of Entry by Les-
sor; IX–Maintenance, Repair and Operation by
Lessor; X–Utility Services; XII–Covenant Against
Discrimination in Employment; XIII–Insurance;
XIV–Damage or Destruction of Premises on Build-
ing Site; XV–Taxes; XVII–Cancellation by Lessor;
XVIII–Cancellation by Lessee; XIX–Supervision
and Abatement; XX–Indemnity; XXI–Quiet Enjoy-
ment; XXII–Title to Equipment, Improvements and
Facilities Erected by Lessee; XXIII–Surrender of
Possession; XXIV–Mineral Rights; XXV–Condem-
nation; XXVI–Assignment and Subletting; XXVII–
Notices; XXVIII–Definition of Terms; XXIX–
Paragraph Headings; XXX–Invalid Provisions;
XXXI–Successors and Assigns Bound by Cove-

nants; XXXII–Right to Lease to United States Government; XXXIII–Provision Against Discrimination; XXXIV–Option to Lease Additional Land; XXXV–Privilege of First Refusal.

Also omitted is the supplement agreement dated May 6, 1963, between the Kent county aeronautics board and Northern Air Service, Inc.