CITY OF DETROIT v. TYGARD.

TYGARD v. CITY OF DETROIT.

1. STATUTES—CONSTRUCTION—ORDINARY MEANING.
   Words of a statute are to be accorded their ordinary meaning in determining legislative intent.

2. SAME—CONSTRUCTION—WORDS AND PHRASES—CONCESSION.
   The word "concession" as used in a statute granting tax exemption to use of municipally owned land for concession at public airport does not mean a leasehold or rental agreement of whatever term (PA 1953, No 189, as amended by PA 1962, No 226).

3. SAME—CONSTRUCTION—WORDS AND PHRASES—CONCESSION.
   The word "concession" as used in a statute granting tax exemption to use of municipally owned land for concession at public airport means a privilege or space granted or leased for a particular use within specified premises, having an element of exclusivity about the use, and a specific obligation of the privileged party to furnish particular services at specified times (PA 1953, No 189, as amended by PA 1962, No 226).

4. AVIATION—CONSTRUCTION OF STATUTES—STORAGE OF AIRCRAFT—PUBLIC AIRPORT.
   The storage of locally based aircraft is not negated as a proper use of a public airport by construction of statute imposing a specific tax upon privilege of using tax-exempt property, such as a public airport (PA 1953, No 189, as amended by PA 1962, No 226).

REFERENCES FOR POINTS IN HEADNOTES
[1–3] 50 Am Jur, Statutes § 225 et seq.
[4, 5] 51 Am Jur, Taxation § 569 et seq.
[6] 5 Am Jur 2d, Appeal and Error § 1009 et seq.

5. TAXATION—LESSEES AND USERS OF TAX-EXEMPT PROPERTY—EX-
EMPTION—CONCESSIONS.

Defendants, lessees of aircraft hangars from an agency of the
city of Detroit, did not come within the exemption from tax-
ation of lessees and users of tax-exempt property provided for
"concessions" granted by municipality in connection with
operation of airport where lease agreements did not purport
to bind lessees to maintain particular services at specified
times, such obligations for benefit of lessor being essential
to a "concession" (PA 1953, No 189, as amended by PA 1962,
No 226).

6. COSTS—CONSTRUCTION OF STATUTES—TAXATION OF USE OF TAX-
EXEMPT PROPERTY.

No costs are allowed on appeal in action by city to collect tax
from lessee of tax-exempt property at city-owned airport and
consolidated action by property users against city for de-
claratory judgment, where construction of a tax statute is
involved (PA 1953, No 189, as amended by PA 1962, No 226).

Appeal from Wayne, Weideman (Carl M.), J., by
leave granted, prior to decision of Court of Appeals.
Submitted June 12, 1968. (Calendar No. 7, Docket
Nos. 51,866, 51,867.) Decided September 25, 1968.

Complaint by the City of Detroit against John L.
Tygard, and others, for taxes assessed and unpaid.
Complaint for declaratory relief by John L. Tygard
and others against the City of Detroit. Actions
consolidated for trial and on appeal. Summary
judgment for plaintiff City of Detroit and for dis-
missal of declaratory action. Defendant Tygard
appeals, by leave granted, prior to decision of Court
of Appeals. Affirmed.

*Robert Reese,* Corporation Counsel, *Julius C. Plis-
kow* and *Joseph Maisano,* Assistants Corporation
Counsel, for plaintiff City of Detroit.

*Lemberg & Gage,* for defendants.

O'Hara, J. This is a case of statutory construction. The statute involved is PA 1953, No 189, as amended by PA 1962, No 226 (MCLA § 211.181, Stat Ann 1968 Cum Supp § 7.7[5]). It is a taxation statute. Both in the Public Acts and the Compiled Laws Annotated, the editorially supplied caption is:

"Taxation of lessees and users of tax-exempt [real] property; exceptions."

The nature of the tax was judicially construed by this Court in *United States* v. *City of Detroit* (1956), 345 Mich 601. The decision was affirmed by the Supreme Court of the United States (1958), 355 US 466 (78 S Ct 474, 2 L Ed 2d 424). We said (p 612):

"Holding, as we do, that the tax imposed is not ad valorem on the property nor on the leasehold, but a specific tax on the privilege of using the property."

So we deal with a specific tax which, however, is imposed in the same amount as the *ad valorem* general property tax on similar realty. The remedy for nonpayment of the tax is an action *in personam* against the users. There is no provision in the act for an action *in rem* and lien against the property. The city of Detroit, plaintiff-appellee, proceeded under the statute against defendants-appellants in one action for taxes assessed and unpaid. Plaintiff Tygard, and numerous others identically situated, sought declaratory relief against the city. The cases were consolidated below and consolidated here.

There are no fact issues. The facts have been stipulated. Appellants Tygard are copartners doing business as Trim-A-Plane Service. They have possession of certain designated T-hangars under written agreements with the Detroit Aviation Commission, an agency of the city of Detroit. The busi-

ness consists of giving flying lessons, ground school courses, instrument flying, and renting, leasing, storing and servicing small aircraft for the public generally. The realty upon which they conduct these operations is owned by the city of Detroit. So owned, it is not taxable. The agreement under which they hold and use the property is on a month-to-month basis terminable with or without cause by the city.[1] The city sued in assumpsit, as provided by the act, and recovered judgment for the unpaid taxes. The declaratory relief was denied. We granted bypass leave prior to decision by the Court of Appeals. The city raises certain questions as to the propriety of the challenge of the taxes and the users of the property contend they have been denied an administrative remedy for the recovery of taxes illegally assessed. We do not consider either question decisionally relevant.

The basic question is the effect of a tax exemption provision in the act. As pertinent it reads:

"When any real property which for any reason is exempt from taxation is leased, loaned or otherwise made available to and used by a private individual, association or corporation in connection with a business conducted for profit, except where the use is by way of a concession in or relative to the use of a public airport, * * * [it] shall be subject to taxation * * * to the same extent as though the lessee or user were the owner of such property."

The nub of the question, as was observed by the learned trial judge, is the meaning of a "concession" as that term was used by the legislature. It was not defined in the act. It has not been heretofore judicially defined by this Court. The question is one of first impression.

---

[1] We use the term "city," "airport" and "commission" interchangeably. There is no legal distinction for purposes of this case.

Perforce we say as we have said uniformly before in determining legislative intent we accord words their ordinary meaning:

"The words of a statute are to be taken in their ordinary signification and import." *Green* v. *Graves* (1844), 1 Doug (Mich) 351, 354.

We think there is a difference between a "concession" and a leasehold or rental agreement of whatever term. Had the legislature intended to include every lease or rental agreement in the exemption heretofore mentioned, we do not believe they would have added the language "where the use is by way of a concession."

We look first to a dictionary definition of "concession":

"A privilege or space granted or leased for a particular use within specified premises."[2]

The example used in the definition is "the soft drink concession at the ballpark." We regard the use of the definite article "the" as significant. It imports to the term "concession" the concept of exclusivity. We do not rest our decision on this concept alone. However, if the privilege granted is exclusive, we think it distinguishes it from the more general type of permissive use. We note that in the suit for a declaration of rights there are numerous other parties privileged as are plaintiffs-appellants.

Next, we believe the concept of specific obligations on the part of the privileged party to maintain particular services at specified times is an incident of a concession. We find no such obligations imposed by the agreement here under consideration. No minimum hours during which the services of-

[2] World Book Encyclopedia Dictionary, p 412.

fered must be made available to the public are required. No standards of service are mandated. Of course, the services offered must bear a reasonable relationship to the purposes of a public airport. That element in part is present here, particularly the storage and servicing of aircraft. We are not furnished any figures as to what percentage of appellants' business is concerned with the storage and servicing of transient aircraft, certainly one of the most important uses of a public airport. We would not be understood to mean that we negate as a proper use of a public airport the storage of locally based aircraft.

We think that a further indication of legislative intent can be found in the related aeronautics code[3] which specifically empowers political subdivisions with the right to "confer concessions * * * upon its airports", bespeaks an intention to assure that the services customarily and needfully required at airports will be assured. It follows that in return for the privilege granted, a corresponding obligation necessarily arises. That is the nature of a concession as we believe the legislature used the term.

Applying all of the foregoing incidents of a concession to the relationship between the aviation commission and appellants, and those identically situated as established by the rental agreement, we cannot but conclude that the city of Detroit did not grant one or any of them a "concession" within the meaning of the statute.

We distinguish *Rockwell Spring & Axle Company v. Romulus Township* (1962), 365 Mich 632, as did the trial judge, as not involving the specific issue of the meaning of "concession." We quote with approval from his well-reasoned opinion:

---

3 CLS 1961, § 259.133 (Stat Ann 1960 Rev § 10.233).

"In the opinion of the court the lease agreements herein in issue do not contain any language or terms conferring upon the lessees a grant of privileges of concessions."

By our holding here we express no opinion upon the merits of any case now pending under the same statute, nor upon any factual situation created by agreements different from those which are in force between appellants and the Detroit Aviation Commission, acting for the city of Detroit. As a convenience to the bench and bar, we append hereto the 1963 agreement between appellants Tygard and appellee city. We note in this connection that the unnumbered paragraph at the end of the instrument did not appear in the 1962 version of the agreement. Save this, they are identical.

The order granting summary judgment to plaintiff city of Detroit in its action against defendants-appellants is affirmed. The order dismissing the complaint of plaintiffs-appellants Tygard and others against the city of Detroit is likewise affirmed. No costs, construction of a statute.

DETHMERS, C. J., and KELLY, BLACK, T. M. KAVANAGH, ADAMS, and T. E. BRENNAN, JJ., concurred.

*Appendix—July 1963 Agreement*

"CITY OF DETROIT MUNICIPAL AIRPORT
11201 Conner Ave., Zone 13 Detroit, Michigan
Phone LA 6–5875
Operated by
DETROIT AVIATION COMMISSION
"AGREEMENT FOR STORAGE OF AIRCRAFT
T-hangar No. 2, 69, 76, 77, 78 & 80

"Agreement made this 15 day of July, 1963, between the Detroit City Airport, a governmental agency of the city of Detroit, Michigan, hereinafter

called the airport, and TRIM-A-PLANE SERVICE hereinafter called the lessee.

"Witnesseth:

"In consideration of the payment of $...... per month, payable on the first day of each month, the airport agrees to let, on a month to month basis, the above designated T-hangar or field storage lot, subject to the conditions and covenants herein contained, and to be used for the following purpose(s):

Flight School—Yes, Business Use—Trim Work
Plane No. N2347N, N7496A, N8376B, N51062, N1327P, Make—Cessnas & One Piper, Twin Engines—One, Single Engine—5
Registered owner—John L. Tygard, address 5067 Somerset, Detroit 24, Michigan
Home phone—VE 9-6500, business phone—Same
Type of pilot's license—Commercial, License No. 95259, Flying hours—13,000
Name and address of bank in which you have your account—Bank of the Commonwealth
Name of one local charge account—General Aircraft Supply
Place of employment—Self
Aircraft insurance company—Airway Underwriters
Address—Ann Arbor and Detroit, Phone—NO 3-0572
Type of insurance carried—Crash P.D. & P.L., 20,000/40,000

"Lessee covenants with airport as follows, to-wit:

"1. To notify airport, in writing, within 10 days, of any change in the information furnished herein.

"2. To abide by all rules and regulations of the Federal aviation agency, State of Michigan and city of Detroit, and of any other duly constituted public authority having jurisdiction.

"3. Lessee shall not sublet or furnish to any other person any office space, hangar, T-hangar, storage space, field storage privilege, or any other right or privilege in or on any airport property without the written consent of the airport manager.

"4. The lessee agrees to accept all facilities on the leased premises on an 'as is basis'; further, the airport hereby disclaims, and owner accepts such disclaimer, of any warranty, either express or implied, of the condition, use, or fitness of the tie down rings, ropes or chains used to secure the airplanes, and owner assumes full responsibility to furnish any equipment necessary to properly secure his aircraft.

"5. Lessee accepts and recognizes that he (it) or his (its) agents are responsible for setting parking brakes, placing chocks, and tying down and checking of their own aircraft.

"6. Lessee further covenants and agrees that he will not hold the city of Detroit or any of its agents, employees, or airport commission members, responsible for any loss occasioned by fire, theft, rain, windstorm, hail, or from any other cause whatsoever, whether said cause be the direct, indirect or merely a contributing factor in producing the loss to any airplane, automobile, personal property, parts or surplus that may be located or stored in the hangars, T-hangars, offices, aprons, field, or any other location at the airport; and lessee agrees that the plane(s), and its contents are to be stored whether on the field or in the hangars at lessee's risk:

"7. Lessee agrees to indemnify, defend, and save airport, its agents, officers, representatives, and employees, harmless from and against any and all liability or loss resulting from claims or court action arising directly or indirectly out of the acts of lessee, his (its) agents, servants, guests, or business visitors under this agreement or by reason of any act or omission of such person.

"8. Lessee agrees to accept airport employees as his (its) agent(s) and to absolve the airport from any liability whatsoever arising while his (its) plane is in the hands of said employees.

"9. That in the event of any misrepresentation or default of the aforementioned representations by

lessee, the airport shall have the right to ground all airplanes and to padlock all offices, shops, bays, and T-hangars of lessee.

"10. The lessee hereby gives and grants to airport a lien upon, and hereby hypothecates to airport, all fixtures, chattels and personal property of every kind and description now or hereafter to be placed, installed or stored by lessee, at the airport; and agrees that in the event of any failure on the part of the lessee to comply with each and every one of the covenants and obligations hereof, or in the event of any default continuing for 60 days of any specified rent, airport may take possession of and sell the same in any manner provided by law and may credit the net proceeds upon any indebtedness due, or damage sustained by airport, without prejudice to further claims thereafter to arise under the terms hereof.

"11. The airport shall have the right to terminate this agreement at any time with or without cause on delivery of written notice to the lessee at his last known address and upon refunding to lessee a pro rata amount of the storage charges heretofore provided for the unexpired portion of the month following the date of such termination; and upon such termination the lessee shall immediately remove said airplane(s) from the Detroit city airport.

"12. The airport shall have the right to enter said premises at any time for inspection or to make repairs, additions or alterations as may be necessary for the safety, improvement, or preservation of the leased premises.

"13. As a condition precedent to their being granted the right to operate at the city of Detroit municipal airport, all flight operators and flying clubs do hereby covenant and agree to carry a minimum of $20,000/$40,000 public liability, $20,000 passenger liability, and $25,000 property damage liability insurance. This policy shall name the city of Detroit as a named insured and shall contain a 30-day notice of cancellation clause. Said insurance

shall be carried with an insurance company duly authorized to do business in Michigan and a certificate showing that said insurance, as provided above, is in force shall be furnished to the city of Detroit.

"14. Flying club lessees do further agree to provide the airport with an up-to-date list, of the names of all members of said club, on the 1st day of January and July of each year in which they operate at the city of Detroit airport.

"15. Lessee hereby acknowledges receipt of a copy of this agreement and a copy of the rules and regulations of the Detroit city airport, said rules and regulations being specifically incorporated by reference as though fully set forth herein, and agrees that he (it) shall be bound thereby.

| 7–15–63 | JOHN L. TYGARD |
| (Date) | (Signature of Applicant) |

| 7–15–63 | W. D. RAY |
| (Date) | (For the Airport) |

*"Lessee agrees to pay in addition to the rent provided for herein all taxes assessed under Act 189 Public Acts of Michigan for 1953, as amended, and any other taxes which lessee may be required by law to pay."* (Emphasis supplied.)