678 A.2d 602

The **MARYLAND–NATIONAL CAPITAL PARK AND PLANNING COMMISSION**

v.

**STATE DEPARTMENT OF ASSESSMENTS AND TAXATION.**

No. 1611, Sept. Term, 1995.

Court of Special Appeals of Maryland.

July 1, 1996.

678

**680**

Isaac H. Marks (Debra Yerg Daniel, on the brief), Upper Marlboro, for appellant.

Jeffrey G. Comen, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and David M. Lyon, Asst. Atty. Gen., on the brief), Baltimore, for appellee.

Argued before MOYLAN, HOLLANDER and EYLER, JJ.

EYLER, Justice.

The 94th Aero Squadron restaurant ("Restaurant"), a privately run concern located on tax exempt property belonging to the Maryland–National Park and Planning Commission ("Commission") in College Park, Maryland, was designed to resemble a fortified French chalet from the World War I era that had been damaged by bombing. In this appeal, the disputants call upon us to decide whether the Restaurant can withstand an "attack" by the State Department of Assessments and Taxation ("Department"), seeking to impose a tax assessment.

After wending their way through four other adjudicative levels, the parties to this appeal, Commission, appellant, and Department, appellee, ask us to answer four questions.

I. Did the circuit court err in ruling that the operation of the 94th Aero Squadron restaurant does not constitute a 'concession' as required by Tax–Property Article, § 7–211?

II. Did the circuit court err in ruling that the 94th Aero Squadron restaurant is not 'available for use by the general public' as required by Tax–Property Article, § 7–211?

III. Did the circuit court err in granting the State Department of Assessments and Taxation's motion to strike?

IV. Did the tax court lose jurisdiction to hear the appeal from the decision of the Property Tax Assessment Appeals Board for failure to hear and decide the appeal on or before 60 days from the date that said appeal was entered, as required by the Tax–Property Article, § 14–512(f)(5)?

I.

In 1973, the Commission, a State-created agency,[1] purchased the historic College Park Airport. The Airport, located in the Calvert Road Park, Prince George's County, is the world's oldest continuously operated airport, and counts, among its other distinctions, the training by the Wright broth-

1. See Article 28, §§ 1–101 to 8–127 of the Annotated Code.

ers of Army Signal Corps pilots on its premises. In October, 1980, the Commission circulated a prospectus that outlined the Commission's interest in soliciting bids from the private sector to construct, operate, and maintain a restaurant "concession." 94th of College Park, Inc. ("94th") and its holding company, Specialty Restaurants Corporation ("Specialty"), the only bidders on the project (hereinafter, "lessee"), entered into a lease with the Commission on May 1, 1981.[2] The lease did not include all of the items detailed in the prospectus, including several that would have imposed specific operational controls. For example, the following section relating to charges to the public was not included.

> The Director of Parks and Recreation shall exercise the authority over rates charged with a reasonable opportunity for the concessionaire to realize a profit on these facilities and services as a whole, commensurate with the investment and obligation assumed. The concessionaire will prepare and submit to the Director of Parks and Recreation for approval a schedule of fees and prices to be charged for all goods or services offered for sale or hire on the premises. No charge will be made for any such goods, or services, except in strict compliance with the approved schedule and any violation of this provision shall constitute grounds for the termination of the license and/or privilege herein granted. In approving rates, primary consideration will be given to the prices charged for similar facilities and services furnished or sold outside the areas administered by the Maryland–National Capital Park and Planning Commission under similar conditions with due regard being given to such other factors as may be deemed significant. The principal objective of such controls is to assure the public satisfactory service and quality merchandise at reasonable rates. The concessionaire will pay all expenses of promoting or operating the concession, including the payment of salaries of such personnel to provide for efficient operation,

---

2. The parties amended the lease on December 12, 1981 and April 23, 1984; neither amendment is pertinent to our discussion.

together with expenses for supplies and all public utility expenses.

The lease began with several recitals, including:

WHEREAS, the Lessor has the power to lease the same to any responsible individual, partnership, or corporation, on such terms and conditions as the Lessor in the exercise of its discretion may deem advantageous to the development of the Park System under its jurisdiction; and

WHEREAS, the Lessor has determined that the Lessee is responsible and that the purposes set forth herein are consistent with the use of the Land for park and recreation purposes; and

WHEREAS, the Lessee desires to take the Land and to construct thereon a Restaurant as defined herein, the (improvements to be constructed on the Land by the Lessee in accordance with this Agreement, being sometimes hereinafter called the 'Improvements'), for the benefit of all of the citizens of the State of Maryland, and, in particular, the citizens of Prince George's and Montgomery Counties.

The Commission granted concession rights to the lessee and indemnified the lessee from the payment of any tax that might be assessed against the fee title or leasehold as follows:

The Lessor hereby grants to Lessee for the period of said Lease (including any extension periods), the right to construct, operate, and maintain upon said Land the Improvements as herein defined in accordance with this Lease, provided the Lessee shall faithfully perform the terms and conditions of this Lease and Agreement. Lessor agrees not to grant the rights as herein granted to any other persons, nor will it construct and operate any financially competitive facility on the premises owned by it adjacent to the Leased Premises during the term of this Lease and Agreement, including any renewal period.

. . .

It is acknowledged by the parties hereto that, because the fee title to the Leased Premises is owned by the Lessor, a

public entity, the Leased Premises are not subject to either ad valorem taxation or possessory interest taxation against the leasehold. Accordingly, the aforesaid percentage rent schedule is structured in consideration of the tax-free status of the Leased Premises and that the Lessor and its assigns hereby indemnifies the Lessee and holds it harmless from any tax which may be assessed against either the fee title or the leasehold of the Lessee.

Paragraph Nine of the lease provided:

USE OF LEASED PREMISES

The Lessee covenants and agrees to operate, manage, and maintain throughout the term hereof, in a good, courteous, and efficient manner a Restaurant (and the other improvements to be constructed by it in accordance with this Lease) and further covenants that it will operate, manage, and maintain the premises in a manner consistent with the purposes of this Lease and the public interest generally.

The lessee was required to provide a capital investment of $900,000 to construct the restaurant facility and to provide $100,000 in working capital. The design of the facility was subject to approval by the Commission. The payment structure of the lease required the lessee to pay to the Commission a flat monthly fee plus a percentage of the lessee's gross receipts.

The Commission and the lessee learned, somehow, that the leasehold was not automatically tax-exempt, as each had assumed, and that application had to be made. Accordingly, they filed a request for an exemption to the Department; the Department denied the request. The matter was next heard by the Property Tax Assessment Appeals Board ("Board") which, in a decision dated July 12, 1993, reversed the Department's denial of the exemption. Unsatisfied with that result, the Department filed an appeal with the Maryland Tax Court on June 30, 1994. More than one year later, on August 25, 1994, the Tax Court conducted a hearing, during which Robert

Young, Associate Director of the Department,[3] Richard Stevenson, Associate Director of the Commission, and Louis Viggiano, Divisional Manager of Specialty and General Manager of the Restaurant testified, respectively. The Tax Court accepted the parties' stipulation that the Restaurant was, in fact, a "restaurant," and that it was located in a public park that contained an airport.[4] After hearing testimony and considering the parties' arguments, the Tax Court reversed the Board's decision and reinstated the assessment.

The Tax Court characterized the question before it as one of law and, specifically, one of statutory interpretation. The Tax Court construed "concession" in § 7–211(b) as requiring specific, detailed, operational controls by the granting authority over the concessionaire and requiring that the service be primarily for the people using the airport, park, market or fairground. There was some evidence that the Commission occasionally checked on the quality of the Restaurant's operation but the Tax Court found there were no specific controls of the type required to be a "concession." The Tax Court further found from the evidence that the Restaurant was primarily used by persons who were not users of the other facilities in the park and airport. In fact, the Tax Court stated that the Restaurant would not be able to survive if it depended upon only those persons using the park and airport. Of note, the Tax Court did not cite any cases to support the construction of the statute. Three days after the Tax Court's decision, the Commission filed a petition requesting the Circuit Court for Prince George's County to review the decision.

In the proceedings before the Circuit Court, the Department filed a motion to strike those portions of the Commission's pleadings that quoted excerpts of Viggiano's deposition testimony relating to the question whether restaurant patrons

---

3. Young had denied the Commission and lessee's request for an exemption.

4. We will accept the stipulation. *See Supervisor of Assessments v. Vestry,* 48 Md.App. 131, 134, 425 A.2d 1383 (1981) ("We decline to accept the stipulation because it was not before the Tax Court.").

also used the park or airport because, the Department contended, the Tax Court had not admitted the deposition into evidence. The Circuit Court granted the motion during a March 23, 1995 hearing and, after listening to the parties' arguments on the merits, took the primary issue under advisement. Thereafter, on August 18, 1995, the Circuit Court issued an opinion and order affirming the Tax Court's decision. The Circuit Court relied on a Tax Court decision rendered in 1970 and two cases decided by the Supreme Court of Michigan, *County of Kent v. City of Grand Rapids,* 381 Mich. 640, 167 N.W.2d 287 (1969), and *City of Detroit v. Tygard,* 381 Mich. 271, 161 N.W.2d 1 (1968).[5] The Circuit Court agreed with the Tax Court's legal ruling but, apparently relying on the dissent in *Kent,* elaborated by ruling that a

---

**5.** In *Kent,* the Court had before it a lease by Kent County Aeronautics Board of hangars on airport property for aircraft storage, maintenance, and operation of a private flying school, and a lease of airport property for motel and restaurant purposes and held the services were "concessions" within the applicable statute. The statute subjected otherwise exempt property to taxation when made available to and used by private individuals in connection with a business conducted for profit "except where the use is by way of a concession in or relative to the use of a public airport ... or similar property which is available to the use of the general public...." *Kent,* 167 N.W.2d at 288. The Supreme Court of Michigan affirmed the trial court and held that the uses were concessions and exempt from taxation and, in doing so, distinguished *City of Detroit.*

In *City of Detroit,* the Court had before it an agreement whereby the Detroit Aviation Commission granted possession of aircraft hangars to the defendants for the purpose of giving flying lessons and the renting and servicing of small aircraft. The claim was for property tax under the same statute as that quoted in *Kent.* In affirming summary judgment in favor of the City of Detroit and holding that the possessory interest was taxable, the Court pointed out that the interest was on a month to month basis and the agreement did not impose any specific obligations on the privileged party. Additionally, the Court relied on the State of Michigan Aeronautics Code that granted political subdivisions the right to confer the privilege of concessions at airports provided that the service was equal, uniform, and generally available to the public. The Court interpreted the statute to require that such service be "assured" and held that the agreement failed to meet the requirement. In doing so, the Court limited its holding to the facts before it.

We set forth the above to note that the results in the above cases are not inconsistent with the result in the case *sub judice.*

"concession" had to meet a three-prong test. First, there had to be more than a leasing agreement. Second, there had to be a specific obligation by service providers to maintain particular services, including a requirement of minimum hours and specific standards and regular supervision. Third, the service had to be customarily and needfully required in a park, airport, market, or fairground. The Circuit Court construed the language "available for use by the general public" as meaning those members of the "general public" who have occasion to be on park property for the use of other park facilities. The Circuit Court's construction was in essence the same as that of the Tax Court. The Circuit Court then held that there was substantial evidence to support the Tax Court's conclusion that the test was not met by the Restaurant. The Commission then noted a timely appeal to this Court from the Circuit Court's judgment.

## II.

The Commission contends that the ordinary meaning of the language in § 7–211(b) leads to a conclusion that the lessee, granted an exclusive right to construct and operate a restaurant with a required motif, is a "concession." The legislative purpose is not inconsistent with that plain meaning and there is no evidence of a contrary legislative intent. Similarly, it contends that the plain language "available for use by the general public" is not restricted to park and airport patrons. Alternatively, the Commission contends that, if the three-part test is a valid construction of "concession," it was satisfied by the evidence; if "general public" is limited to park and airport patrons, the evidence is insufficient to support the finding that the Restaurant was primarily used by non-patrons of the park and airport.

The Department argues that the statutory provision in question is a tax exemption and, as such, must be strictly construed. Thus, it contends, the Tax Court and the Circuit Court interpreted the statute correctly.

### III.

■■■ Despite its name, the Tax Court is not a judicial body, but rather, is an administrative agency that. acts in a quasi-judicial capacity. *Shell Oil Co. v. Supervisor of Assessments*, 276 Md. 36, 38–48, 343 A.2d 521 (1975); *see* §§ 3–101 to 3–113 of the Tax–General Article. Our review of the Tax Court's decision is precisely the same as that of the Circuit Court. *DHMH v. Riverview Nursing Centre, Inc.*, 104 Md. App. 593, 601, 657 A.2d 372, *cert. denied*, 340 Md. 215, 665 A.2d 1058 (1995). The "substantial evidence" test is our guide when reviewing the Tax Court's factual findings. *Id.* at 602, 657 A.2d 372. When reviewing questions of law, on the other hand, we are free to substitute our judgment for the judgment of the Tax Court, and we seek to determine whether it erred as a matter of law. *Id.*

The General Assembly's use of the term "concession" in § 7–211(b) is the crux of this dispute.

(b) *Public use.*—An interest of a person in property of the federal government, the State, a county, or a municipal corporation is not subject to property tax, if the property is used for a concession that:

(1) is located in a public airport, park, market, or fairground; and

(2) is available for use by the general public.

■■■ If, as in the instant case, the parties call upon us to interpret an exemption, we first look to the general principles of statutory construction, and then, narrowing our inquiry, turn to those principles that are applicable to the taxation arena. Ever mindful of our desire to discern and effectuate the General Assembly's intent, *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423 (1995), we examine the language of the enactment and give to the language its natural and ordinary import. *Montgomery County v. Buckman*, 333 Md. 516, 523, 636 A.2d 448 (1994). If the language is plain and free from ambiguity and expresses a definite and sensible meaning, we will, ordinarily, end our inquiry. *Id.* We are not, however, rigidly bound to the precepts of the "plain meaning" rule.

*Department of Gen. Servs. v. Harmans Assocs. Ltd. Partnership,* 98 Md.App. 535, 545, 633 A.2d 939 (1993). Where the General Assembly has chosen not to define a term used in a statute, we will give that term its ordinary and natural meaning and will not resort to subtle or forced interpretations for the purpose of extending or limiting the operation of the statute. *Brown v. State,* 285 Md. 469, 474, 403 A.2d 788 (1979). Furthermore, we examine the entire statutory scheme and consider the purpose behind the particular statute before us. *Department of Public Safety v. Howard,* 339 Md. 357, 369, 663 A.2d 74 (1995). Cognizant that the language of the statute is the foundation from which our inquiry commences, we also review legislative history and the prior state of law, and contemplate the particular evil, abuse, or defect that the General Assembly wished to remedy with the enactment of the statute at issue. *Lemley v. Lemley,* 102 Md.App. 266, 290, 649 A.2d 1119 (1994). Moreover, the examination of related statutes is not beyond our reach. *GEICO v. Insurance Comm'r,* 332 Md. 124, 132, 630 A.2d 713 (1993).

When interpreting tax exemptions, we strictly construe the exemption and resolve any doubt in the taxing authority's favor. *Comptroller v. Martin G. Imbach, Inc.,* 101 Md.App. 138, 145, 643 A.2d 513, *cert. denied,* 336 Md. 593, 650 A.2d 239 (1994); § 7–101 of the Tax–Property Article ("Property tax exemptions provided under this title shall be strictly construed."). In *Suburban Propane Gas Corp. v. Tawes,* 205 Md. 83, 87, 106 A.2d 119 (1954), Judge Collins recited for the Court of Appeals the judicial approach towards interpreting tax exemptions.

Of course, tax exemption statutes are to be strictly construed in favor of the State. The taxing power is never presumed to be surrendered. Every assertion that it has been relinquished must, to be effective, be distinctly supported by clear and unambiguous legislative enactment. To doubt an exemption is to deny it. However, the tax exemption statute should not receive a strained or unreasonable construction that would defeat the purpose of the legislative enactment.

(Citations omitted). In the final analysis, the real legislative intent prevails. *Comptroller v. Fairchild Indus.*, 303 Md. 280, 288, 493 A.2d 341 (1985). The burden of showing that an exemption. is allowed under the law falls upon the claimant. *Pittman v. Housing Auth.*, 180 Md. 457, 460, 25 A.2d 466 (1942).

The parties do not point us to, nor have we found, any reported opinion in this State interpreting the term "concession" as used in § 7–211(b). Thus, we turn to the precursor of that section, § 8(8)(e) of Article 81, which the General Assembly approved as emergency legislation effective May 8, 1961, for further information.[6]

(8) *Leaseholds and Other Limited Interests in Real or Personal Property.*—No leasehold or other limited interest in real or tangible personal property shall be subject to taxation except the following which shall be subject to taxation in the same amount and to the same extent as though the person in possession or the user thereof were the owner of such property.

. . .

(e) The interest or privilege of any lessee, bailee, pledgee, agent, or other person in possession of or using any real or personal property which is owned by the federal or State governments, and which is leased, loaned, or otherwise made available to any person, firm, corporation, association, or other legal entity, with the privilege to use or possess

---

6. We will refer to those amendments that are germane to this discussion. The exemption in question first appeared in the 1961 legislation. Our research leads us to conclude that the 1961 legislation was in response to the decision by the Court of Appeals in *Martin Co. v. State Tax Comm'n*, 225 Md. 404, 171 A.2d 479 (1961). The Court of Appeals held that a certain possessory interest in personal property owned by the United States Government was not subject to tax in the possession of the Martin Company. The statutory scheme, as it existed prior to 1961, and the major impetus for the 1961 legislation, is of no help with respect to the issue before us. We are not aware of any legislative history pertinent to the interpretation of the exemption at issue other than as referred to in this opinion.

such property in connection with a business conducted for profit, except where the use is by way of a concession for occupancy of a public airport, park, market, fairground, or similar property, which is available to the use of the general public, shall be subject to taxation in the same amount and to the same extent as though the lessee or user were the owner of such property; provided, that the foregoing shall not apply to federal or State property for which negotiated payments are made in lieu of taxes by any of the aforesaid owners, nor shall it apply to any real or personal property which is owned by the federal or State governments and which is in the possession of any person, persons or corporation who or which is engaged in (1) the manufacture, construction, or assembling of equipment, supplies or component parts thereof, to be used for national defense purposes, or (2) research or development for national defense purposes, nor shall it apply to port facilities owned by the federal or State governments (or any agencies or instrumentality thereof) (or by any political subdivision of the State of Maryland). Provided further that for purposes of municipal and county taxation in the counties of Allegany, Anne Arundel, Montgomery, and Washington, any such interest or privilege shall not be subject to assessment and taxation. As used herein, the term 'port facilities' shall mean and shall include, without intending thereby to limit the generality of such term, any one or more of the following or any combination thereof: Lands, piers, docks[,] wharves, warehouses, sheds, transit sheds, elevators, compressors, refrigeration storage plants, buildings, structures, and other facilities, appurtenances and equipment necessary or useful in connection with the operation of a modern port or in connection with shipbuilding and ship repair and every kind of terminal or storage structure or facility now in use or hereafter designed for use in the handling, storage, loading or unloading of freight or passengers at steamship terminals, and every kind of transportation facility now in use or hereafter designed for use in connection therewith.

Effective July 1, 1967, the General Assembly eliminated the words "or similar property" following the word "fairground." Chapter 414, Acts 1967. In 1968, the General Assembly redesignated § 8(8)(e) as § 8(6)(e) of Article 81. That change did not last long, for in 1970, the General Assembly renumbered § 8(6)(e) as § 8(7)(e) and eliminated "real or" preceding "personal property" and substituted "pursuant to a contract with such federal or State governments for" instead of "who or which is engaged in." Chapter 526, Acts 1970. The 1983 amendment divided subparagraph (e) into sub-subparagraphs and substituted "federal, State, county, or municipal" for "federal or State." Chapter 640, Acts 1983. In 1985, the General Assembly repealed § 8(7)(e) of Article 81, along with other sections and subsections, reenacted, and recodified them in the Tax–General and Tax–Property Articles. Chapter 8, Acts 1985. The Revisor notes that, for clarity, the term "municipal corporation" was substituted for the term "municipal governments" and the reference to "for occupancy," was deleted as superfluous. Section 7–211(b) appeared at that time and has not been amended since.

The General Assembly has used the term "concession" in other contexts.[7] The most pertinent use, for our purposes, is Article 28, § 5–110:

---

7.  In related contexts, the term appears in the following sections:

    a.  § 11–501(h)(1) of the Commercial Law Article (Title 11, Trade Regulation; Subtitle 5, Cigarette Sales Below Cost Act);

    b.  § 5–301 8.3 & 8.4 of the Environment Article (Title 5, Water Resources; Subtitle 3, Interstate Water Compacts);

    c.  § 8–1311(b) of the Natural Resources Article (Title 8, Water and Water Resources; Subtitle 13, Patuxent River Watershed);

    d.  § 14–109(a)(5) of the State Finance and Procurement Article (Title 14, Preferences; Subtitle 1, Preferences to benefit disadvantaged individuals);

    e.  § 9–929(c)(1) of the State Government Article (Title 9, Miscellaneous Executive Agencies; Subtitle 9, Maryland Veterans' Home Commission);

    f.  § 6–301(r)(7(i) & (iii) of Article 2B (Alcoholic Beverages; Title 6, Beer, Wine and Liquor Licenses; Subtitle 3, Class C (On Sale));

    g.  § 8–202(g)(1) & (i)(1) of Article 2B (Title 8, Local Licenses and License Provisions; Subtitle 2, Local Jurisdictions);

(Maryland–National Capital Park and Planning Commission) (Title 5, Property; Powers; Recreation Program; Subtitle 1, Metropolitan District Property and Powers Generally) (emphasis added)

The Commission may (1) lease for a term not exceeding 40 years and renew the lease from time to time for additional terms not exceeding ten years each, to any responsible individual, partnership or corporation, any portion of the lands within the metropolitan district, acquired for park purposes under any of the provisions of this article. The Commission may not enter into any lease agreement in excess of 20 years duration without the prior approval of the provisions of the lease by legislative enactment of the county in which the lease property is located in whole or in part. Further, all such lease agreements shall contain provisions for reversion without cost to the Commission of the property and its improvements regardless of whether the improvements were added to the property by the lessee during the term of the lease or any extension of the lease; and/or (2) grant privileges, permits, and/or *concessions*, and/or enter into contracts relating to the same, with any

---

h.  § 9–217(f)(1)(ii)3. of Article 2B (Title 9, General Provisions on Issue of Licenses; Subtitle 2, Local Jurisdictions);
i.  § 11–517(g)(1) of Article 2B (1995 Supp.) (Title 11, Hours and Days For Sale; Subtitle 5, Local Jurisdictions);
j.  § 2A(d) of Article 23A (Corporations—Municipal);
k.  Article 25, § 3D(c) (county commissioners), Article 25A, § 5A (c) (chartered county), and Article 25B, § 13B(d) (code county);
l.  § 249(b) of Article 27 (Crimes and Punishments);
m.  § 13–105(4) of Article 41 (Governor–Executive and Administrative Departments) (Title 13, Miscellaneous Statewide Development and Assistance Programs; Subtitle 1, Maryland Food Center Authority);
n.  § 14–701(b)(4) of Article 41 (Title 14, Local Economic and Community Development Programs; Subtitle 7, Ocean City Convention Hall); and
o.  § 4.01(c)(2)(ii) of Article 66B (Zoning and Planning).

The term also appears in unrelated contexts. *See* §§ 11–504(b), 11–505(a)(4), and 11–509 (price concession) of the Commercial Law Article; §§ 6–504(d)(2)(ii) and 16–510(a)(4) (collective bargaining) of the Education Article; and §§ 2–112.1(j)(2) and 5–114.1(e)(1) (collective bargaining) of Article 28.

responsible individual, partnership, or corporation, to engage in any business or enterprise on lands acquired for park purposes within the metropolitan district under any of the provisions of this article; all on terms and conditions the Commission deems advantageous to the development of the park system as a part of the Maryland–Washington Regional District within the metropolitan district. The purpose for which the property is leased, and/or the privileges, permits, and/or *concessions* are granted, may not be inconsistent with the use of the property for park purposes. Any lease and/or contract executed under the authority of this section shall contain a condition, stating specifically the purposes for which the property is leased, and/or the privilege, permit, or *concession* is granted. All agreements entered into by the Commission pursuant to this article shall contain provisions forbidding the assignment of the agreement without the consent of the Commission. This article may not be interpreted as a limitation on the Commission's authority to require in any agreement more restrictive provisions deemed by the Commission to be in the public interest. The provisions of this article may not be construed to validate any lease or agreement executed prior to July 1, 1972, which provides for an initial term beyond 20 years duration, nor to permit the renegotiation of any lease or agreement executed prior to July 1, 1972, for the purpose of extending the initial term of the lease beyond 20 years duration. This limitation does not apply to any lease with a nonprofit, service-oriented organization.

Keeping in mind, for present, the General Assembly's use of the term "concession," we turn to the statutory scheme before us. In Maryland, leaseholds and other limited interests in property are generally not subject to property tax. § 6–102(a) of the Tax–Property Article ("Except as otherwise provided in this section, a leasehold or other limited interest in property is not subject to property tax."). Government-owned property is not subject to taxation if devoted to a governmental use or purpose, except as provided in § 6–102. § 7–210(a) of the Tax–Property Article. The non-taxable status applies to property

owned by a State agency only to the extent a law exempts the property. § 7–210(b) of the Tax–Property Article. Lands acquired by the Commission pursuant to Article 28 are exempt from "State, county, and municipal taxes." Art. 28, § 5–109(a). Interests in government-owned property are, unless otherwise exempted, taxable.

(e) *Interests in government property.*—Unless exempted under § 7–211 or § 7–501 [public leasehold property—local exemptions] of this article, the interest or privilege of a person in property that is owned by the federal, the State, a county, or a municipal corporation government is subject to property tax as though the lessee or the user of the property were the owner of the property, if the property is leased or otherwise made available to that person:

(1) by the federal, the State, a county, or municipal corporation government; and

(2) with the privilege to use the property in connection with a business that is conducted for profit.

§ 6–102(e) of the Tax–Property Article.

The above analysis leads us to § 7–211(b). The facts before us satisfy the first three elements found in that section. The parties do not dispute that the facts establish an "interest" (leasehold) of a "person" (Restaurant)[8] in property of the State (Commission).[9] The next element, and one that is contested, is that the property should be "used for a concession." Furthermore, the "concession" must be located in a "public airport, park, market, or fairground" and be "available for use by the general public." The parties have stipulated that the Restaurant is located in a park that contains a public airport.[10] Thus, if we conclude that the Restaurant qualifies

---

**8.** *See* § 1–101(w) of the Tax–Property Article (definition of person).

**9.** *See* § 5–107 of Article 28 (title to lands acquired under Article 28 are vested in the State or the Commission).

**10.** *See Supervisor of Assessments v. Washington Nat'l Arena Ltd. Partnership,* 42 Md.App. 695, 402 A.2d 148 (1979) (interpreting term "park" as used in precursor to § 7–211(b)).

as a "concession," we would then need to determine whether it is "available for use by the general public." The Commission bears the burden of showing that the Restaurant fulfills the requirements necessary to qualify for the exemption. *Pittman*, 180 Md. at 460, 25 A.2d 466.

Slightly more than seventy-five years ago, Judge Briscoe considered for the Court of Appeals the use of the word "concession" in a lease between the Hotel Belvedere and John Williams, a barber. *Belvedere Hotel Co. v. Williams*, 137 Md., 665, 113 A. 335 (1921), annotated in 14 A.L.R. 622 (1921). Williams operated a barber shop and manicuring concession in the hotel. During Williams' lease and concession term, the Hotel leased out to William Zentgraff the "front room on the first floor of the building known as No. 1023 North Charles Street ... to be used for a barber shop." *Id.* at 668–69, 113 A. 335. Shortly after Zentgraff opened his barber shop, Williams sought injunctions

> to restrain the Belvedere Hotel Company from maintaining, or permitting to be maintained, in the hotel and on the premises of Hotel Belvedere, any barber shop other than that of the one conducted by the appellee, or from in any manner attempting to injure the business of the appellee, in violation of his rights under the original agreement of lease between the Belvedere Hotel Company and the appellee.

*Id.* at 669–70, 113 A. 335. The Circuit Court for Baltimore City heard the case and issued injunctions against the Hotel and Zentgraff, who, respectively, appealed the judgment. *Id.* at 671, 113 A. 335.

Evidence elicited at trial established that the Hotel had, in the past, used 1023 North Charles to house guests, but that it was currently being used, apart from Zentgraff's barber shop, to store furniture. *Id.* at 672, 113 A. 335. Although the main Hotel building was located at the southeast corner of Charles and Chase Streets, 1023 North Charles adjoined it on the south, and direct communication between the two could be had through a doorway opening on the "summer garden" and between the Hotel lobby and Zentgraff's barber shop. *Id.*

The Court concluded that 1023 North Charles Street was an adjunct part of the Hotel, and that under Williams' lease, the Hotel had granted to him the "sole and exclusive right to operate a barber shop and a manicuring establishment in the Hotel Belvedere." *Id.* at 672–73, 113 A. 335. Judge Briscoe then turned to the term "concession."

The plain language of the lease is that the party of the first part agrees to lease to the party of the second part the barber shop and manicuring concession in its hotel for a term of two years.

The use of the word 'concession' in the lease, we think, shows an intent to convey more than a part of the premises. As stated by the appellee in his brief, the concession granted by the lease was the concession 'in its hotel,' and was clearly intended to be the concession of the privilege for the entire hotel.

In Vol. 2, *Words and Phrases*, 1386, it is said: 'The English word, 'concession,' derived from the Latin word in its ordinary use, is exactly or nearly the equivalent of the word grant,' and the word 'concessi' in a lease implies a covenant for quiet enjoyment.'

*Id.* at 673, 113 A. 335. On the facts before the Court, Judge Briscoe held that the Circuit Court correctly and properly granted the injunctions against the Hotel and Zentgraff. *Id.*

The result reached by the Court in *Belvedere Hotel Co.* may be supported under either an exclusive grant approach, *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 137 A.2d 687 (1958) (exclusive covenant in a lease to sell alcoholic beverages for off-premises consumption in shopping center held to extend to subsequently constructed "Second Section") or a duty of loyalty to refrain from destructive competition. *Automatic Laundry Serv., Inc. v. Demas*, 216 Md. 544, 141 A.2d 497 (1958) (lessee agreed to operate laundry and provide adequate service; Court held landlord under implied obligation not to compete destructively with lessee).

As noted in *Belvedere Hotel Co.*, the fundamental meaning of the term "concession" is a "grant" of some right. The

"grant" is the *sine qua non,* upon which the degrees or levels of control may be appended.

The General Assembly is cognizant that degrees or levels of control may be layered upon a "concession."

> (2) Each municipal corporation shall have the authority to displace or limit competition by granting one or more franchises for any *concession* on, over or under property owned or leased by the municipality on an exclusive or nonexclusive basis, to control prices and rates for such franchises; to establish rules and regulations to govern the operation of the franchises, to provide for the enforcement of any such measure; and to lease or sublease publicly owned or leased land, improvements to land, or both on terms to be determined by the municipality without regard to any anticompetitive effect.

§ 2A(d)(2) of Article 23A (emphasis added). Under § 5–110(2) of Article 28, the General Assembly granted to the Commission the discretion to grant concessions "on terms and conditions the Commission deems advantageous to the development of the park system as a part of the Maryland–Washington Regional District within the metropolitan district." That grant of discretion is not, however, unfettered because "[t]he purpose for which the property is leased, and/or the privileges, permits, and/or concessions are granted, may not be inconsistent with the use of the property for park purposes." [11]

To return to the language of the tax exemption at issue, we note that testimony heard by the Tax Court established that the Restaurant was available to serve and served both patrons and non-patrons of the Calvert Road Park. The Department argues that we must go one step further and evaluate the Restaurant's primary use by calculating how many persons came to the Calvert Road Park for the sake of going to the park and found the Restaurant to be an added incentive to

---

11. The parties do not contend that the existence of the Restaurant is inconsistent with the use of the property for park purposes.

frequent the Park. Continuing with that reasoning, if the majority of individuals came only to the Restaurant and did not avail themselves of the Park's attractions, the Restaurant had become not "available to the general public." We must reject the interpretation urged upon us by the Department, and adopted by the Tax Court. As noted above, the evidence adduced below was uncontroverted that the Restaurant was open and available to all members of the general public.[12]

---

12. Before the Tax Court, Young testified that the Restaurant's pricing scheme excluded, on an economic basis, members of the general public.

> [T]he pricing here serves a select segment of the community that has the means to pay these particular prices. One of the things that the statute requires is that it's got to be available for the general public use. And we [the Department] had a series of cases, such as the Asbury Methodist case, which say if you only serve a select segment of the community who have the means to pay for a certain service— in other words de facto you've factored out the majority of the population, you're not serving the public.

We are troubled by Young's reliance on *Supervisor of Assessments v. Asbury Methodist Home, Inc.*, 313 Md. 614, 547 A.2d 190 (1988). The issues in that case related to the Tax Court's decision to deny a property tax exemption to a nonprofit, charitable corporation. *Id.* at 616, 547 A.2d 190. Reviewing § 9(a) and (e) of Article 81, recodified as § 7–202 of the Tax–Property Article, Chief Judge Murphy, writing for the Court, concluded, in part, that the Tax Court correctly denied the exemption sought by the corporation. Section 9(e)(2) provided:

> any nonprofit charitable, fraternal or sororal, benevolent, educational, or literary institutions or organizations when ... actually used exclusively for and necessary for charitable, benevolent, or educational purposes (including athletic programs and activities of an educational institution) in the promotion of the general public welfare of the people of the State.

The corporation had sought a tax exemption for apartments units within its housing complex. Although the corporation accepted applicants for its home and health center regardless of their ability to pay, applicants to the apartments faced economic obstacles. *Asbury*, 313 Md. at 616–17, 547 A.2d 190. Chief Judge Murphy concluded that the corporation was not entitled to the exemption because, in part, the fees generated by the apartment units at issue were not "necessary for" and "actually used for" the uses enunciated in § 9(e)(2) and that because no resident had invoked the financial misfortune clause of the resident agreement (an apartment resident in need of financial assistance could remain in the apartments or the corporation's other living quarters as long as that individual had exhausted his or her financial resources, remained a resident within the complex, and the assistance given to that individual did not impair the corporation's ability to operate and

The grant of a concession to the Restaurant by the Commission is unambiguous and unequivocal. As noted in the lease:

The Lessor hereby grants to Lessee for the period of said Lease (including any extension periods), the right to construct, operate, and maintain upon said Land the Improvements as herein defined in accordance with this Lease, provided the Lessee shall faithfully perform the terms and conditions of this Lease and Agreement. Lessor agrees not to grant the rights as herein granted to any other persons, nor will it construct and operate any financially competitive facility on the premises owned by it adjacent to the Leased Premises during the term of this Lease and Agreement, including any renewal period.

Pursuant to the lease and the reasoning of *Belvedere Hotel Co., Slice,* and *Automatic Laundry Serv., Inc.,* the Restaurant would be able to bring an action against the Commission or any entity for interfering with its concession rights.

■ The language in the tax exemption must be strictly construed; nevertheless, the construction must be fair and consistent with legislative intent as expressed in the language, context, purpose, and relevant legislative history. We are not free to amend a statute under the guise of a canon of construction. We have consulted several dictionaries[13] and

---

provide services), *i.e.,* the apartments benefitted individuals who did not require financial assistance.

We do not find the principles discussed by Chief Judge Murphy in *Asbury* applicable to the interpretation of "available for use by the general public," as provided in § 7–211(b)(2). Moreover, the focus is not upon whether the Restaurant is "necessary for" and "actually used for" the benefit of the Calvert Road Park, but rather, whether the concession is "available for use by the general public."

**13.** BLACK'S LAW DICTIONARY 289 (6th ed.1990):

A grant, ordinarily applied to the grant of specific privileges by a government. . . .

WEBSTER'S NEW WORLD DICTIONARY 129 (1983):

a privilege granted by a government, company, etc., as the right to sell food at a park.

WEBSTER'S NEW COLLEGIATE DICTIONARY 233 (1973):

a grant of land or property esp. by a government in return for services or for a particular use. . . .

find, consistent with *Belvedere Hotel Co.*, that the word "concession" means, in essence, a grant of some right. This carries with it, by implication, the power to grant or withhold the right and to determine the degree of exclusivity and control. The right may be subject to restrictions defined by the terms of a lease or other form of agreement and by applicable law. In this case, the only restriction imposed by law is that the facility be "available for use by the general public." With respect to that restriction, the statute provides "available for use"—not actual use—"by the general public"— not a certain segment of the public. The plain and ordinary meaning of the language in the statute, read in context, is not inconsistent with the legislative purpose to empower governmental bodies to encourage development of facilities for public use in parks, airports, markets, and fairgrounds and does not lead to an absurd result. *See Lincoln Nat'l Life Ins. Co. v. Insurance Comm'r*, 328 Md. 65, 82, 612 A.2d 1301 (1992).

### IV.

■ The Commission argues that the Tax Court was divested of jurisdiction to hear the dispute below because that Court did not conduct a hearing on the merits within the sixty days directed by the General Assembly for that purpose. Section 14–512(f)(5) of the Tax–Property Article sets forth the time-frame during which the Tax Court shall determine an appeal taken from the property tax assessment appeal boards.

---

BALLENTINE'S LAW DICTIONARY 238 (3d. ed.1969):
the right to do business upon the premises of another, such right normally being granted to one for the sale of candy, drinks, programs, and merchandise at exhibitions and amusement places....
WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (unabridged) 470 (1981):
a grant of land or other property esp. from a government in return for services rendered or proposed or for a particular use ... a usu. exclusive right to undertake and profit by a specified activity ... a lease of premises or a portion of premises for a particular purpose, esp. for some purpose supplementary to another activity ... or for providing entertainment....

(f) *Appeals from property tax assessment appeal boards; exhaustion of administrative remedies.*

. . .

(5) The Maryland Tax Court shall hear and determine all appeals under this subsection on or before 60 days from the date the appeal is entered.

In contrast to § 14–512(f)(5), § 13–519 of the Tax–General Article directs that the Tax Court "shall hear and determine appeals promptly." Nowhere within title 3 (Maryland Tax Court) or title 13, subtitle 5 (Appeals and Judicial Procedures Generally) of the Tax–General Article or within title 14, subtitle 5 (Appeal Procedures and Judicial Procedures—In General) of the Tax–Property Article, do we find the consequences of transgressing the sixty day period.

██ Maryland courts have not interpreted the term "shall" as mandatory if such a construction would produce impractical results. *Wyatt v. Johnson,* 103 Md.App. 250, 258, 653 A.2d 496 (1995). Additionally, "whether a statute is considered mandatory or directory must be ascertained from the provisions of the statute itself, and a construction that is internally inconsistent must be avoided." *Id.*

In *In re Keith W.,* 310 Md. 99, 104, 527 A.2d 35 (1987), the Court of Appeals stated that it has "previously recognized that a statute or rule may be mandatory and yet not require dismissal as a sanction for failure to comply with its provisions." *See also MVA v. Shrader,* 324 Md. 454, 462, 597 A.2d 939 (1991). In *In re Keith W.,* the Court rejected the juvenile's argument that dismissal of the petition against him was warranted because the circuit court, juvenile division, failed to schedule his case within the time prescribed by former Maryland Rule 914. The factors considered by the Court in *In re Keith W.* were summarized by Judge Karwacki for the Court in *Shrader.* The issue before the Court in *Shrader* was whether failure of the Motor Vehicle Administration (MVA) to schedule and conduct timely hearings, as directed by § 16–205.1(f)(5)(i) of the Transportation Article, warranted dismissal

of the MVA's orders of suspension. *Shrader*, 324 Md. at 457, 597 A.2d 939. Judge Karawacki discussed for the Court the factors to be considered when such a question arises.

First and foremost, the purpose and policy of the statute or rule must be considered in determining the appropriate sanction. . . .

[T]he statute or rule must be reviewed to determine whether a sanction for non-compliance is specified. . . .

Finally, the sanction to be imposed for non-compliance in a specific case may depend upon whether the party seeking dismissal can demonstrate prejudice from the non-compliance.

*Id.* at 463–69, 597 A.2d 939.

The Court of Appeals has employed the same reasoning in different contexts. *MSBA, Inc. v. Frank*, 272 Md. 528, 325 A.2d 718 (1974) ("shall" as used in Attorney Grievance statute directing time within which to hold hearing not mandatory); *Garland v. Director of Patuxent Institution*, 224 Md. 653, 167 A.2d 91 (1961) ("shall" as used in § 594 of Article 27 directing time within which to hear motions for new trial not mandatory); *Scherr v. Braun*, 211 Md. 553, 128 A.2d 388 (1957) ("shall" used in statute directing that failure of court to determine appeal within thirty days after filing of record, unless time extended for good cause shown, mandatory because statute provides as sanction automatic affirmance of agency's decision); *Snyder v. Cearfoss*, 186 Md. 360, 46 A.2d 607 (1946) ("shall" used in § 23, Article IV of the Maryland Constitution directing that circuit court judges render decisions in cases before them within two months of argument or submission not mandatory); and *McCall's Ferry Power Co. v. Price*, 108 Md. 96, 69 A. 832 (1908) (motion for reconsideration denied on grounds that "shall" as used in § 15, Article IV of the Maryland Constitution directing that an opinion, in writing, be filed within three months of argument or submission not mandatory).

Turning to the circumstances of the case before us, we are not persuaded to adopt the interpretation urged by the Com-

mission. Prompt resolution of administrative and judicial disputes serve, without a doubt, the interests of justice. Those interests may not be viewed in isolation, however, and must be considered in light of administrative concerns and resources. As noted by Chief Judge William B. Calvert of the Tax Court, who presided over the appeal:

> [i]f that statute had to be followed exactly the way it's written and if there w[ere] no leeway in connection with it, there would be a lot of th[ese] cases that would be dismissed because it would just be absolutely impossible to hear them.

Although the General Assembly announced, generally, that the Tax Court "shall hear and determine appeals promptly," and, specifically, that the Tax Court "hear and determine all appeals ... [from the Board] on or before 60 days from the date the appeal is entered," the General Assembly did *not* provide for a sanction if that Court failed to comply with the legislative mandate. Furthermore, on appeal, the Commission does not allege that it was prejudiced by the Tax Court's untimely action. Before the Tax Court, the Commission had argued that

> the failure of the Tax Court to hear and determine said appeal within 60 days as required, prejudice[d] M–NCPPC in that the 94th Aero Squadron continues to be assessed additional property taxes for the 1994, 1995 (and soon to be) 1996 fiscal years.... This is the exact scenario that section 14–512(f)(5) was designed to avoid.

The Commission wisely abandons that argument here, for it is without merit. Section 14–514 of the Tax–Property Article addresses and resolves that concern.

> An appeal of property tax does not stay or affect the collection or enforcement of the property tax or a classification, unless for personal property a person submits to the agency responsible for collecting the property tax a bond:
>
> (1) to the State;
>
> (2) with corporate surety approved by the Department; and

(3) conditioned on the payment of the property tax and all interest that accrues on the property tax until paid.

## V.

We need not address question III presented by appellant because the answer is irrelevant in light of our construction of the statute and our answer to questions I and II.

For the reasons expressed in this opinion, we reverse the judgment of the Circuit Court.

JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.